IN THE MATTER OF PROPOSED INCREASED INTRASTATE INDUSTRIAL SAND RATES BY THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, R. D. TIMPANY, TRUSTEE.

Argued February 5, 1974—Decided October 23, 1974.

14

*Mr. J. Edgar McDonald,* of the New York bar, argued the cause for the appellant Trustee (*Mr. Richard B. Wachenfeld,* attorney).

*Mr. Howard T. Rosen* argued the cause for the respondents Thatcher Glass Manufacturing Co., Owens-Illinois, Inc., Midland Glass Co., Metro Container Corp., and Pennsylvania Glass Sand Corp. (*Messrs. Rosen and Weiss,* attorneys; *Mr. Howard T. Rosen,* of counsel; *Mr. Walter G. Reinhard,* on the brief).

*Mr. William Gural,* Deputy Attorney General, argued the cause for the Board of Public Utility Commissioners (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HUGHES, C. J. The Central Railroad Company of New Jersey ("CNJ" or "railroad") has been so impoverished that since 1967 it has been a Debtor in Reorganization under the Bankruptcy Act under the supervision of the United States District Court for the District of New Jersey, has

been forced to appeal to the Interstate Commerce Commission for permission to abandon some of its interstate operations and for a number of years has been assisted in the maintenance of its passenger service in New Jersey by substantial contractual grants from the State under *N. J. S. A.* 27:1A–15 *et seq.* In such straits, it sought relief as to certain of its freight carriage rates by publishing and filing tariffs with the New Jersey Board of Public Utility Commissioners ("PUC"), which proposed increases were suspended temporarily by PUC under the statute and in accordance with its practice. Many months of public hearings ensued and on August 10, 1972, PUC issued a "negotiation order" purportedly under the provisions of *N. J. S. A.* 48:2–21.1[1] permitting such increased rates to become effective. Shippers affected appealed that order and on February 22, 1973, in an unreported decision, the Appellate Division announced its dissatisfaction therewith on the ground that despite the substantial record compiled during those hearings "* * * the board made no basic findings from which it could make the ultimate finding that the new rates were just and reasonable," and thus remanded the cause for the determination of such

---

[1] 48:2–21.1 *Adjustment of rates during pendency of hearing*

The board may, during the pendency of any hearing instituted by it, on its own initiative or on petition, in which the approval or fixing of just and reasonable individual rates, joint rates, tolls, charges or schedules thereof, as well as commutation, mileage or other special rates is in issue, or at any other time, negotiate and agree with any public utility for an adjustment of the individual rates, joint rates, tolls, charges or schedules thereof, as well as commutation, mileage or other special rates for any product or service supplied or rendered by such public utility. Such adjustment may be for, or without, a specified limit of time. In no event shall any such adjustment be regarded as contractual. Such adjustment shall at all times be subject to change through the proceedings provided for by this chapter, or through negotiation and agreement under this section. The board as a part of any such negotiation and adjustment shall provide for the continuance, suspension or other disposition of any hearing of the character aforesaid then pending.

Amended by *L.* 1962, *c.* 198, § 14.

elements and supportive findings of fact.[2] Pending such determination the Appellate Division directed all shippers affected by the increases to deposit with the Clerk of the Superior Court sums representing the added charges, disposition of the monies so deposited to await the ultimate determination of this proceeding. The Appellate Division retained jurisdiction.

Thereafter PUC, having reconsidered the matter, filed its Decision on Remand including its determination that the average revenue per car at the old rates exceeded out of pocket costs at three destinations but was less than out of pocket costs at two, and that under the proposed increased rates, revenue would be expected to exceed costs at all destinations except one (where truck competition forced the railroad to keep rates low). In its decision PUC declared:

Although cost of capital has been allowed for in the proposed rates on the industrial sand shipments herein, respondent will still be operating at a loss overall, and the overall rate of return will still be a negative figure. However, the Board is of the opinion that respondent should have the opportunity to reduce its losses in order to assist it towards a viable reorganization for the purpose of carrying out its public service duties. [Decision on Remand, Apr. 12, 1973, Docket No. 718–506]

The increased rates affected only a small area of CNJ operations, the transportation of industrial sand from point of origin to several glass manufacturing companies in northern New Jersey which have, throughout this litigation, challenged the validity of the PUC action. The design of the rates as increased would yield an additional $500,000 annually, characterized as representing about one percent of CNJ total revenues. The Board accepted, as basic to its de-

_____

2"Accordingly, the cause hereby is remanded to the Board of Public Utility Commissioners * * * to the end that the Board may make a determination of whether the increased tariffs are just and reasonable, and the findings of fact essential to that determination." [App. Div., Feb. 22, 1973, Docket No. A–3433–71]

cision, CNJ's cost study which, it determined, fairly represented "* * * reliable approximations or estimates of industrial sand out-of-pocket freight operating expenses, rents and taxes (including federal income taxes) plus an allowance for the cost of capital * * *." In this posture it determined:

The Board is satisfied that the proposed increased rates which have been found reasonably compensatory herein are just and reasonable and, therefore, *Hereby Approves* said proposed increased rates * * *.

There is no suggestion in the record of the establishing of a rate base, or an appropriate rate of return thereon. As the Board stated on August 10, 1972 (in certifying the compatibility of the increases permitted by its "negotiation order" with national standards imposed under the Economic Stabilization Act of 1970):

(5) This Board did not consider it appropriate, in this particular. proceeding, to compute a rate base, nor any specific allowance as overall rate of return thereon, * * *.

In its position as a party in this appeal, PUC would justify its failure to find a rate base and a fair rate of return, viewing such findings as an "exercise in futility," as argued with much logical force in its brief to the Appellate Division:

A finding of rate base and a rate of return for this company as urged by appellants would be an exercise in futility. * * * To put this railroad to the expense of proving a rate base and requiring it to employ a rate of return expert would only compound the financial problems of the railroad and increase its losses. The railroad will still be operating at a loss if this rate increase is approved. The rate of return will be a negative figure. Ordinarily, when this Board makes a determination of the rate of return it must also determine whether or not such return is reasonable. When there is no rate of return there is nothing for the Board to pass upon with respect to reasonableness, so that such a finding would be an empty gesture. Similarly, with respect to rate base which is one of the components used in determining a rate of return, there is no need to make this calculation when a utility will continue to sustain losses both before and after a rate increase is granted. A requirement that the Board

find rate base and rate of return in this case would serve no useful purpose.

The Appellate Division, after its second scrutiny of PUC action increasing the rates, held (*In re Industrial Sand Rates, 125 N. J. Super.* 48 (1973)) that the approval of rates, without establishment of a rate base and the fair rate of return thereon, could not be justified as a permanent matter (as distinguished from an interim increase), under the "negotiation" statute (*N. J. S. A.* 48:2–21.1, *supra*), the scope of that statute being confined "* * * to interim relief pending a proceeding to determine the justness and reasonableness of an existing or proposed rate." Nor was the Appellate Division able to find that CNJ's factual situation as to its sand freight revenues vis-a-vis its fully allocated costs attributable to that service, brought it within the relevant section of the "three exceptional and extraordinary situations" spelled out by the Legislature in *N. J. S. A.* 48:2–21.2, in which PUC is not bound to find a rate base.[3] This Court granted certification on the petition of CNJ, 63 *N. J.* 585 (1973).

█ CNJ argues before us, however, that in its action PUC was not examining the "justness or reasonableness of any existing rate, * * * " or "prescribing a just and reasonable rate, * * *" as contemplated by the last mentioned statute, but was merely "approving" an increase in rates. This

---

[3] 48:2–21.2. *Circumstances under which board not required to find rate base*

In arriving at any determination as to the justness or reasonableness of any existing rate, fare or charge or in prescribing a just and reasonable rate, fare or charge, the board shall not be bound:

1. To find a rate base, if it determines that

(a) the applicable operating expenses plus depreciation and taxes of conducting the business, for which the rate, fare or charge is established, computed on the basis of the 12 months next preceding the month in which the proceeding is initiated, exceeds the revenue from such operation, during said period, under the existing rates, fares or charges and that the revenue under the proposed increased rates, fares or charges will not exceed such operating expenses, depreciation and taxes, * * *.

distinction must be intended to suggest that in such case the increase could be viewed as something superimposed upon an existing rate which, at some time in the perhaps distant past, had been determined to be just and reasonable and that, therefore, the fairness and justness of such an "approved" increase should be determinable by lesser proofs (say, the relationship of fully allocated costs to the revenues of the service) than the usual foundation proofs of rate base and reasonable rate of return as establishing the justness and reasonableness of the rates. For the reasons hereinafter stated, we can discern no merit in this point.

In affirming the judgment of the Appellate Division we think it it in the public interest to review and clarify some of the basic principles involved in the rate-regulation function and authority of PUC. The twin spectres of inflationary pressures causing rate increases, and what is commonly viewed as an impending energy crisis, have aroused public concern and have inspired legislative interest in reviewing the extent to which the legislative power of rate making has been delegated.[4] Thus, an examination of the legislative standards which are indispensable to proper delegation of the rate-making power, and the just application of those standards in practice, such as questioned in the present difficult case, would seem timely and useful.

 At the outset it must be noticed that the court itself has no power to fix rates, a role firmly disavowed in the words of Chief Justice Gummere long ago:

The power to fix rates is not a judicial function, but a legislative one, and the state has created the Board of Public Utility Commissioners as its agent for that purpose. An attempt by the Supreme Court to fix a rate is in its essence an attempt to exercise a sovereign power which has not been delegated to it by the state, but which resides solely in the legislative and executive branches of the govern-

---

[4] At least 13 pieces of legislation dealing with PUC powers and policies, or utility rates, are presently pending in the New Jersey Legislature.

ment. [*Hackensack Water Co. v. Pub. Utility Bd.*, 96 *N. J. L.* 184 (E. & A. 1921)]

Yet this view in no way inhibits the responsibility or power of the court in its review of the propriety of PUC actions, for as the Chief Justice further commented in the same case:

\* \* \* [W]e have no doubt of the power of the \* \* \* [c]ourt to send the case back to the board where it appears to the court that the action complained of was the result of a misapprehension by the board as to the duty imposed upon it by the statute \* \* \*.

The exercise of this power in modern aspect is confirmed by the statute itself.[5]

---

[5]*N. J. S. A.* 48:2-46 *Setting aside orders*

The Superior Court, appellate division is hereby given jurisdiction to review any order of the board and to set aside such order in whole or in part when it clearly appears that there was no evidence before the board to support the same reasonably or that the same was without the jurisdiction of the board.

No order shall be set aside in whole or in part for any irregularity or informality in the proceedings of the board unless the irregularity of informality tends to defeat or impair the substantial right or interest of the appellant.

Amended by *L.* 1962, *c.* 198, § 26.

*N. J. S. A.* 48:2-47 *Ordering rehearing by board*

If, with respect to any order brought under review it shall appear equitable and just that a rehearing should be had before the board, the Superior Court, appellate division may order that a rehearing be had before the board upon such terms and condtions as are reasonable. The board shall thereupon proceed to a rehearing on the evidence upon which the order under review was based, and upon such additional evidence, if any, as may be produced. As the result of the rehearing the board may readopt the order or alter, amend, modify or extend it.

The Supreme Court of New Jersey on appeal from a judgment of the Superior Court, appellate division to review an order of the board, may, whenever it shall deem it equitable and just that a rehearing should be had before the board, remit the record and proceedings before it to the Superior Court, appellate division to the end that said court may order that such rehearing may be had before the board upon such terms and conditions as are reasonable, as hereinbefore provided.

Amended by *L.* 1962, *c.* 198, § 27.

In the opinion of this court in *Public Service Coord. Trans. v. State*, 5 *N. J.* 196 (1950), Chief Justice Vanderbilt reviewed some well recognized principles of law, mentioning previous determinations

> * * * that rate making is a legislative and not a judicial function, and that the Board of .Public Utility Commissioners, to which the Legislature has delegated its rate making power, is vested with broad discretion in the exercise of that authority. * * * For the delegation of the legislative function to be valid under our Constitution it is essential that adequate standards be prescribed by the Legislature and adhered to by its agent, in this instance the Board. * * * The statutory standard prescribing the rate-making powers of the Board is to be found in *R. S.* 48:2–21(b) (1), which provides that the Board may "Fix just and reasonable individual rates * * * whenever the Board shall determine any existing rate * * * to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential." In any case in which the reasonableness of the fixed rate is challenged and the fulfillment of the statutory standard thereby subjected to judicial review, the court is duty bound to weigh the evidence and resolve for itself the issue of reasonableness. * * * [at 214–215] [citations omitted]

Chief Justice Vanderbilt recalled the holding in *Pub. Serv. Gas Co. v. PUC*, 84 *N. J. L.* 463 (Sup. Ct. (1913) ; rev'd in part, 87 *N. J. L.* 581 (E. & A. 1914) ; but aff'd *in toto* on rehearing, 87 *N. J. L.* 597 (E. & A. 1915) ; and appeal dismissed, 242 *U. S.* 666, 37 *S. Ct.* 243, 61 *L. Ed.* 552 (1917), to the effect that:

> The presumption in favor of the acts of a judicial or *quasi* judicial tribunal does not apply with the same force to a legislative tribunal, * * * Under the Public Utilities act, the commissioners are given extensive powers of legislation and are given the power of initiating proceedings themselves. The manner in which these powers shall be exercised involves often a consideration of large questions of public policy or business wisdom. [84 *N. J. L.* at 467–468]

But despite the considerable reach of the powers thus delegated, the Chief Justice went on to declare that, "The justness and reasonableness of a particular rate of fare can only be determined after an examination of a company's property valuation which constitutes its rate base; its expenses, includ-

ing income taxes and an allowance for depreciation; and the rate of return developed by relating its income to the rate base. These three factors constitute the first of the two steps referred to by Chief Justice Stone in *Federal Power Commission v. Natural Gas Company,* 315 *U. S.* 575, 584, 62 *S. Ct.* 736, 742, 86 *L. Ed.* 1037, 1048 (1942), when he said:

'The establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other. The first is the adjustment of the general revenue level to the demands of a fair return. The second is the adjustment of a rate schedule conforming to that level so as to eliminate discriminations and unfairness from its details.' " [5 *N. J.* at 216]

In applying these principles Chief Justice Vanderbilt held that in determining the reasonableness of the fare it was incumbent upon the Court to consider the reasonableness of each of these three factors, it being axiomatic that if any one of the three be not reasonably supported by the proofs, the rate of fare itself is unreasonable. Thus it was held in *Public Service Coord. Trans. v. State, supra,* that the determination of an adequate rate base is fundamental in any rate proceeding, the rate base being the fair value of the property of the public utility that is used and useful in the public service. This for the reason that a "utility is entitled to a just return upon the fair value of the property at the time of its employment for the convenience of the public, and the public to protection against unreasonable exactions" and that "[a] rate based upon an excessive valuation or upon property not used or useful in the rendition of the service subject to such regulation obviously would lay upon the individual user a burden greater than the reasonable worth of the accommodation thus supplied. The public is not to be laden with unreasonable or extortionate rates in order that dividends may be provided for the utility's stockholders. The base rate figure of fair value is determined by viewing the plant as an integral and unitary whole, considering all the elements properly en-

tering into the ascertainment of a reasonable return for supplying the public need." *Atlantic City Sewerage Co. v. PUC,* 128 *N. J. L.* 359, 365–366 (Sup. Ct. 1942), aff'd 129 *N. J. L.* 401 (E. & A. 1943).

■ The theory that in emergent circumstances, such as caused by the inflationary impact of rising labor and material costs on operations, there could sometimes be a valid rate increase, on a permanent basis, without exploring the rate base and considering the consequent rate of return thereon (which was once the law of this state, *O'Brien v. PUC,* 92 *N. J. L.* 44 (Sup. Ct. 1918), aff'd 92 *N. J. L.* 587 (E. & A. 1919)) has long since been discarded. *Public Service Coord. Trans. v. State,* 5 *N. J. supra* at 225.

■ And while it was once thought by our courts to be just and reasonable to permit a utility, by a surcharge on newly established rates, to recoup revenue deficiencies which it had suffered in the recent past (at least where such losses were caused not by poor management or other utility fault but by operation of law, *i. e.,* the insufficiency of the former rates to yield a fair rate of return, *Hackensack Water Co. v. PUC,* 98 *N. J. L.* 41 (Sup. Ct. 1922), aff'd 100 *N. J. L.* 177 (E. & A. 1924)) that philosophy, too, has been specifically overruled. *In re N. J. Power & Light Co.,* 15 *N. J.* 82 (1954).

And of course this rule, of looking to the future and not the past, works both ways. In *Los Angeles Gas & Electric Corp. v. R. R. Comm'n of California,* 289 *U. S.* 287, 313, 53 *S. Ct.* 637, 647, 77 *L. Ed.* 1180, 1197 (1933), the Supreme Court held:

> Deficits in the past do not afford a legal basis for invalidating rates, otherwise compensatory, any more than past profits can be used to sustain confiscatory rates for the future.

■■ The law has thus developed, no doubt, because the system of rate regulation and the fixing of rates thereunder are related to constitutional principles which no legislative or judicial body may overlook. For if the rate for the service

supplied be unreasonably low it is confiscatory of the utility's right of property, and if unjustly and unreasonably high (bottomed as it is on the exercise of the police power of the state, *Great Northern Ry. Co. v. State of Washington,* 300 U. S. 154, 57 S. Ct. 397, 81 L. Ed. 573 (1936)), it cannot be permitted to inflict extortionate and arbitrary charges upon the public. And this is so even where the rate or limitation on the rate is established by the Legislature itself. In *Municipal Gas Co. v. Public Service Comm'n,* 225 N. Y. 89, 121 N. E. 772 (Ct. App. 1919), the court dealt with the statute by which the New York Legislature had fixed the maximum charge for gas in the City of Albany at a specified figure. Deemed fair and just when fixed, the passage of the years and changed conditions (the rising cost of labor and material after World War I) had made it much lower than would represent a fair rate of return on the utility property. The utility sought relief from the statute on the ground that these changes had caused its terms to become confiscatory in effect. As against the argument that the utility had in these circumstances "the historic right" of petition to the Legislature for relief against oppression, Judge Cardozo answered:

But that is not its only right. * * * It has the right, now also grown historic, to invoke, when constitutional immunities are threatened, the judgment of the courts. [121 N. E. at 774]

And, of course, Judge Cardozo saw such "constitutional immunities" as inhering in the public which pays as well as in the entity which receives. In a case dealing with the exercise of the right of eminent domain by the State of New York he spoke of the need to "ascertain and determine the compensation which ought 'justly' to be made by the public" (*New York, Ontario & Western R.R. Co. v. Livingston,* 238 N. Y. 300, 306, 144 N.E. 589, 591 (1924)) and quoted the United States Supreme Court in a similar case as follows:

* * * it is the duty of the State, in the conduct of the inquest by which the compensation is ascertained, to see that it is just, not merely to the individual whose property is taken, but to the public

which is to pay for it. [*Searl v. School District No. 2, Lake County,* 133 *U. S.* 553, 562, 10 *S. Ct.* 374, 377, 33 *L. Ed.* 740, 746 (1889)]

The vital justification for the "negotiation statute" and rates established under it, temporarily bypassing the establishment of rate base and fair rate of return, rests upon the legal umbilical cord which ties them to the anticipated eventual determination of these fundamentals; at which time the temporary rates, their legitimacy having been validated, merge into the PUC judgment ordaining the final rate structure or, if and to the extent found to have been excessive, are refunded to the consumers who paid them. Such interim relief permits the utility to escape the unfair and sometimes confiscatory impact of "regulatory lag," *i.e.,* the considerable time necessary for final resolution (perhaps after the exhaustion of appeals to the courts after a complex full-blown "rate case") of a rate increase predicated upon the justice and reasonableness, in the context of rate base, of a rate of return on its investment. In practice, PUC makes it clear that such increase is temporary and conditional, such as in its order of January 16, 1959, granting a utility substantial interim rate relief in *In re Matter of Public Service Electric & Gas Co.,* 36 *PUR* 3d 135 (1960). The order provided:

> 5. That should the Board ultimately determine that the temporary increase in revenues is excessive and not warranted, the Company will refund to its gas customers to whom said increases may be charged all or such part of said increase as the Board shall subsequently determine. [*Id.* at 139]

In entering a similar protective order in *In re Jersey Central Power & Light Co.,* PUC Docket No. 698–540, June 25, 1970, PUC President Ozzard acknowledged that "at this point in the rate proceeding presently before us, we cannot determine fully and finally the ultimate issues such as rate base; the allowable level of operating expenses; the fair rate of return; and the appropriate rate design to produce reasonable revenues." He then went on to explain the crucial

necessity of utility construction to provide necessary service in the public interest, and the consequent need for substantial interim relief. At the same time he indicated the means by which the public would eventually be protected as the case developed, as follows:

> On the other hand, if we grant immediate interim relief and it should be finally determined that all or part of such increases were excessive, we can and will rectify such results in fixing permanent rates at the conclusion of these proceedings by providing refunds to customers.

This "open end" concept finds additional support in the provision of the statute inhibiting the vesting of contractual rights, for it provides, with regard to the interim adjustment accommodated by it, that "[i]n no event shall any such adjustment be regarded as contractual." *N. J. S. A.* 48:2-21.1, *supra.*

And thus it is, as well said by the Appellate Division (*In re Industrial Sand Rates, supra*) that the authority granted to the Board to negotiate with the utility for an adjustment of the individual rates "must be confined to interim relief pending a proceeding to determine the justness and reasonableness of an existing or proposed rate * * * [for] [w]ere *N. J. S. A.* 48:2-21.1 to be otherwise construed rates could be negotiated by the utility with the Board on a permanent basis, completely without regard to the resultant rate of return to the utility and absent any other legislative standards indispensable to a proper delegation of the rate-making power. In the present case the Board has approved the new rates which, admittedly, were fixed by way of negotiation with the carrier, on a permanent rather than on an interim basis. Lacking such authority, the orders from which the appeals are taken cannot be sustained * * *."

It might well be, at another time and under different circumstances that (where a complete restructure of system rates is not involved) rates just and reasonable as reflecting a fair rate of return on that small part of the rail system

and trackage used and useful in furnishing the particular service, as here, could be established. Such technique at least would have the virtue of sparing the shippers from paying more than the value of the service to them in order to help alleviate deficiencies in "the overall rate of return." By the same token, it might prevent those shippers from benefiting by inordinately low rates made possible because of high prosperity (instead of the current destitution) of revenue returns from the other parts of the system. Such separation of rate base is recognized under special circumstances as appropriate, to the end that one class of customer will not be required to subsidize the other and that the rates fixed be just and reasonable with reference to the particular service supplied. *Public Service Gas Co., 84 N. J. L. supra* at 469; *"The Minnesota Rate Cases,"* (Simpson v. Shepard), *230 U. S. 352, 33 S. Ct. 729, 57 L. Ed.* 1511 (1913); *Municipal Gas Co. v. Public Service Comm'n, supra; Valparaiso Lighting Co. v. Public Service Comm'n, 190 Ind.* 253, 129 *N.E.* 13, 18 (Sup. Ct. 1920); *State v. City of Greensboro, 244 N.C. 247, 93 S.E.* 2d 151, 153 (Sup. Ct. 1956); *Northern States Power Co. v. City of St. Paul, 256 Minn.* 489, 99 *N.W.* 2d 207, 214 (Sup. Ct. 1959).

Yet it would be idle to suppose that such procedure would save much of the expense, aggravation and loss of time incident to the normal full-fledged "rate case"[6] for just allocations and the like would require, perforce, an examination of the whole rate base and other total factors of the system. The difficulty and magnitude of such a scrutiny was described in a note to *"The Minnesota Rate Cases," supra,* in discussing *Western Ry. of Ala. v. R.R. Comm. of Ala.,* 197 *F.* 954 (D.C.M.D. Ala. 1912):

---

[6]Described in strong terms by Justice Swayze in *O'Brien v. Public Utility Board, supra,* 92 *N. J. L.* at 46: "* * * long, expensive, unsatisfactory, necessarily too slow to afford prompt relief, and sure to do injustice by delay to one side or the other."

The only feasible way in which the value of the property of an interstate railway company devoted to the use of intrastate commerce can be ascertained is, first, to find the value of the entire property employed in common in both interstate and intrastate commerce, and then to find by a comparison of the volumes of its revenue in each business, or by some other measure, what proportion is used in each, and thus to arrive at the value of the property devoted to intrastate commerce. * * * Distribution of operating expenses, effected by experts skilled in railroad transportation, in proportion to gross revenue, with an extra load for local business, varying in amount according to varying conditions, has generally been accepted in ascertaining the value of the property that the carrier devotes to local business. [57 *L. Ed.* at 1516]

But even if a full rate case were to be contemplated by this besieged railroad, and if in such new circumstance the instant increased rates were to be "negotiated" in course thereof it is unlikely that past deficiencies in rates could be recovered, whether they accrued before or after the abortive action of PUC which was set aside by the Appellate Division (*In re Industrial Sand Rates, supra*). As we have seen, our courts have disapproved such looking to the past and laying upon present and future customers burdens which should have rested upon the former (*In re N. J. Power & Light Co., supra*). Justice Holmes in explaining why the establishment of a utility rate was "the making of a rule for the future," it being an act legislative in nature, once wrote:

A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, * * *. [*Prentis v. Atlantic Coast Line Co.*, 211 *U. S.* 210, 226, 29 *S. Ct.* 67, 69, 53 *L. Ed.* 150, 158 (1908)]

These realities no doubt account for the expression of hope by counsel at the argument of the cause here, that there would be finality in this Court's disposition thereof. We, as was the Appellate Division, are not unmindful of nor unsympathetic to the difficulties and problems confronting many

rail carriers including CNJ. We further have an appreciation of the reasoning by which PUC endeavored, by the negotiation of the instant rates, to assist the survival of this railroad. It, like many carriers in the industrial northeast, has been so squeezed by inflationary pressures, changes in traveling habits of the public and other factors including national equivocation with regard to the support of mass transit, that one wonders what the outcome will be. None of these considerations, however, changes the principles of the law. Whatever remedy is to be found, if indeed a solution there can be, must be sought not in the courts but in the legislative halls. There might be an inclination, for instance, with regard to a bankrupt railroad already partially supported by the State (*N. J. S. A.* 27:1A–15, *supra*), whose continued public service is critically important to the State's economy, to add to the "exceptional and extraordinary situations" already existing in which the ascertainment of rate base is dispensed with (*N. J. S. A.* 48:2–21.2, *supra; In re Industrial Sand Rates, supra*). But (within constitutional limits of course) this is clearly a matter for the Legislature.

The Court must therefore affirm the decision of the Appellate Division, setting aside the PUC action and remanding the cause to the Board to enter an order disapproving the increases in rates proposed, and requiring the Clerk of the Superior Court to make appropriate refund to the several shippers of the monies they have deposited in obedience to the order of the Appellate Division.

*For affirmance* — Chief Justice HUGHES and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—7.

*For reversal*—None.