IN THE MATTER OF THE PETITION OF LANDFILL AND DE-VELOPMENT COMPANY FOR AN INCREASE IN RATES.

Superior Court of New Jersey
Appellate Division

Argued October 15, 1985—Decided December 19, 1985.

6

Before Judges FURMAN, COHEN and ASHBEY.

*Glen Filippone,* Burlington Assistant County Solicitor, argued the cause for appellant Board of Chosen Freeholders of the County of Burlington (*Michael J. Hogan,* Burlington County Solicitor, attorney; *Anton Muschal,* Assistant County Solicitor, on the brief).

*John F. Pilles, Jr.* argued the cause for intervenor-appellant Township of Eastampton (*Schlesinger, Schlosser, Foy & Harrington,* attorneys; *John E. Harrington,* Township Solicitor, of counsel and *John F. Pilles, Jr.,* on the brief).

*Theodore A. Schwartz* argued the cause for respondent Landfill & Development Company (*Schwartz, Tobia & Stanziale,* attorneys; *Steven T. Singer,* on the brief).

*Robert J. Bernot,* Assistant Deputy Public Advocate, argued the cause for respondent Division of Rate Counsel (*Alfred A. Slocum,* Acting Public Advocate, attorney; *Robert J. Bernot,* on the letter brief).

*Antoinette Bennett,* Deputy Attorney General, argued the cause for respondent Board of Public Utilities (*Irwin I. Kimmelman,* Attorney General, attorney; *Antoinette Bennett,* on the letter brief).

COHEN, J.A.D.

Landfill and Development Company (L & D) operates a solid waste disposal facility in Burlington County. It applied to the Board of Public Utility Commissioners (BPU) for an increase in rates to raise some $12.9 million to pay for closure measures and post-closure maintenance required by the Department of Environmental Protection (DEP). L & D's petition was opposed, and the matter was therefore transferred to the Office of Administrative Law as a contested case. After proceedings there, Administrative Law Judge (ALJ) Diana C. Sukovich issued an initial decision which was subsequently adopted in a ruling of BPU granting the requested increase. Burlington County and Eastampton Township appealed to this court, and we now affirm essentially for the reasons contained in the May 9, 1984 decision of BPU in which it adopted the thorough opinion of Judge Sukovich dated March 22, 1984. For emphasis, we add some necessary comments.

L & D operates subject to the economic regulation and supervision of BPU, *N.J.S.A.* 48:2–13; *Twp. of Deptford v. Woodbury Ter. Sewerage Corp.,* 54 *N.J.* 418, 424 (1969), and subject to DEP jurisdiction over the environmental aspects of its facility. *N.J.S.A.* 13:1E–24; *A.A. Mastrangelo, Inc. v. Environmental Protection Dep't.,* 90 *N.J.* 666, 672 (1982). L & D cannot operate without approval of both agencies, *N.J.S.A.* 13:1E–5a; *N.J.S.A.* 48:13A–6. BPU fixes rates and determines whether a proposed increase in a utility's rates is "just and reasonable." *N.J.S.A.* 48:2–21.

In September 1982, DEP approved L & D's amended registration and engineering design which embodied measures for closure and post-closure maintenance required by the new Sani-

tary Landfill Facility Closure and Contingency Fund Act. *N.J. S.A.* 13:1E–100 *et seq.* and *N.J.A.C.* 7:14A–1.1 *et seq.* It contemplated operation until September 1985 when L & D would be filled to capacity. In May 1983, L & D petitioned BPU for a rate increase to pay for the newly required improvements. It estimates of the cost of $12.9 million and its remaining capacity of 3.83 million cubic truck yards have not been seriously challenged.

After L & D's May 1983 petition, there was a prehearing conference in July and a public hearing in August. Hearings before the ALJ were scheduled for September 12 and October 19, 20 and 21. Interim deadlines were set for discovery and submission of issues and witness lists.

After the September 12 hearing, apparently successful settlement discussions resulted in the preparation of a stipulation permitting the rate increase, with the proceeds to be paid into an escrow fund supervised by DEP and BPU. Withdrawals were to be made from the fund solely for closure and post-closure maintenance costs with the excess, if any, available for further environmental purposes.[1]

The October hearing dates were cancelled because of the apparent settlement, except that on October 20 a discussion was held on the record before the ALJ about the terms of an agreement which generally satisfied L & D, the Public Advocate as rate counsel, and BPU staff. Other parties attended to express their positions. No opposition was raised by the two appellants here or any other party. The appellants said they would look to L & D and its parent corporation if escrowed funds were insufficient to pay all closure and maintenance

---

[1]The escrow fund was patterned after the funds envisioned by the terms of the Sanitary Landfill Facility Closure and Contingency Fund Act, *N.J.S.A.* 13:1E–109. Because the legislation came so late in the life of so many of our State's landfills, the statutorily mandated escrows will frequently be insufficient to fund the necessary expenditures. Thus arise rate increase petitions like the present one.

costs. At the end of the discussion, L & D was to circulate the stipulation for execution. By letter dated October 26, the ALJ advised the parties that a failure to object to the stipulation would be taken as an expression of no opposition.

The stipulation which circulated varied in insignificant respects from the October 20 version. On November 7, the stipulation was filed, executed by L & D, the Public Advocate and BPU staff. Every other party (including the County) except Eastampton Township promptly advised the ALJ that they did not oppose adoption of the stipulation but that they would not formally execute it.

In a December 6 letter, Eastampton objected to the stipulation and stated its new position that current ratepayers should not bear the entire $12.9 million burden. In a December 7 letter, Eastampton sought a resumption of the hearings.

Oral argument was held on December 13 on Eastampton's motion for further hearings. The ALJ denied the motion on the ground that Eastampton had not raised any meritorious issues as to the reasonableness of L & D's petition. Eastampton's said it wanted to challenge reasonableness based on an investigation of L & D's past profits, retained and future earnings and assets. It had not earlier objected to the receipt in evidence of L & D's financial documents required by *N.J.A.C.* 14:1–6.16. It had not proposed to call witnesses or offer other evidence. At oral argument it had not witnesses to name or evidence to identify in response to the ALJ's repeated requests for an offer of proof on the subjects Eastampton said merited further hearings.

The County did not join Eastampton's position. It raised no objection to the stipulation and urged upon all of the parties the emergent nature of the situation arising out of the rapid depletion of the capacity of the landfill. Every day that went by in litigation was one day less that money could be raised for the escrow fund.

After circulation of Judge Sukovich's March 22, 1984 initial decision, Burlington County, for the first time, raised new and additional issues. It contended that the rate increase should be only a temporary and refundable one; that the improvement costs could not yet be measured and their validity determined; that the landfill's capacity was in dispute; that past ratepayers, whose solid waste contributed to the problems causing the closure expenses, should bear their share of the burden, and that solid waste generators might be forced to contribute to satisfy their federal Superfund liabilities. 42 *U.S.C.A.* §§ 9601–9657.

Like BPU, we are satisfied that, although Eastampton made an insufficient showing to justify further hearings, its arguments could not be ignored on the basis of their lateness. We are further satisfied that the arguments and those raised even later by the County have no merit.

We comment on some of the issues. First is the liability of former ratepayers. A fair case can be made for the proposition that closure and post-closure maintenance costs were traceable in large measure to the solid waste already in place in L & D's facility. For that reason, it is regrettable that the rates paid in former years did not make provision for the substantial expenses now to be incurred.

BPU could not lawfully remedy that situation by directing L & D to surcharge its current customers for a ratable portion, based on their earlier deposits in the landfill, of the closure costs that should have been included in past rates. Neither could BPU order L & D to bill past customers for the difference between the rates they paid and what, by some hindsight calculation, they should have paid. *In re N.J. Power & Light Co.*, 15 *N.J.* 82, 92–93 (1954); *In re Intrastate Industrial Sand Rates*, 66 *N.J.* 12, 23 (1974); *In re Lambertville Rates v. N.J. Bd. Pub. Util. Comm'rs*, 79 *N.J.* 449, 457 (1979). Of course, L & D's customers are largely licensed solid waste haulers. If L & D were to surcharge them or retroactively bill them, the

haulers would have to absorb the additional cost unless they had some means of retroactively billing solid waste generators. As well as unlawful, the idea would be unworkable as a practical matter.

Applications for rate increases to fund solid waste disposal facility closures must be handled promptly. The unfortunate fact is that many facilities are near the end of their useful lives. Applications must therefore deal with limited and quickly diminishing capacity. A mechanism is available under *N.J.S.A.* 48:2–21.1 for the negotiation by BPU and the utility of interim rates while an application for an increase is pending, subject to an order for rebate if the interim rates are found not to be just and reasonable. *In re Revision of Rates Toms River Water Company,* 82 *N.J.* 201, 210 (1980). We urge the utilization of this mechanism to permit interim effectuation of apparently just and reasonable increases pending BPU review.

The appellants raise the question of L & D's past profits and current ability to bear part of the closure costs underlying its petition. BPU correctly found there was nothing in the evidence to justify consideration of the issue. It also correctly concluded that past profits cannot be used to sustain confiscatory rates for the future. *Los Angeles Gas & Electric Corp. v. R.R. Comm'n of California,* 289 *U.S.* 287, 313, 53 *S.Ct.* 637, 647, 77 *L.Ed.* 1180 (1933); *In re Intrastate Sand Rates, supra,* 66 *N.J.* at 23. We do not, however, understand BPU to have ruled that the past is completely irrelevant. If objectors to future petitions properly raise the issue and if the evidence justifies it, we assume BPU will consider whether increased closure costs arise solely from enhanced DEP requirements, or whether some of them represent unsatisfied obligations of the utility accrued from past noncompliance with DEP registration requirements for which funds had been included in prior rates. If an operator collected in the past to defray DEP-mandated costs and pocketed the collections without satisfying the obligations, and if current closure costs are thereby increased, the ratepayers cannot be required to pay twice while the operator

remains enriched. It was the lack of evidence that resolved the matter in the present case, and not the lack of legal merit in the argument. We appreciate that development of evidence and the trial of such issues may take some time. To avoid delay, the negotiation of interim rates is an available and useful mechanism.

Affirmed.