IN RE RESOLUTIONS NO. 88–68 AND NO. 88–56 ADOPTED BY THE HACKENSACK MEADOWLANDS DEVELOPMENT COMMISSION.

IN RE THE PETITION OF THE BOROUGH OF NORTH ARLINGTON, BERGEN COUNTY, AND THE TOWN OF KEARNY, HUDSON COUNTY, FOR SOLID WASTE HOST COMMUNITY BENEFIT—DOCKET NO. SO88070827.

Superior Court of New Jersey
Appellate Division

Argued April 26, 1989—Decided May 23, 1989.

Before Judges GAULKIN, BILDER and ARNOLD M. STEIN.

*Howard T. Rosen* argued the cause for appellants Robert Janiszewski, County of Hudson and Hudson County Improvement Authority (*Clapp & Eisenberg,* attorneys; *Agnes I. Rymer* and *Harvey C. Kaish,* on the brief).

*Craig J. Huber,* Deputy Attorney General, argued the cause for respondent Hackensack Meadowlands Development Commission (*Peter N. Perretti, Jr.,* Attorney General, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel).

*Charles S. Cohen,* Deputy Attorney General, argued the cause for respondent Board of Public Utilities (*Peter N. Perretti, Jr.,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Rinaldo M. D'Argenio* argued the cause for respondent Borough of North Arlington (*Smith, Don, Alampi, Scalo & D'Argenio,* attorneys).

*Norman A. Doyle, Jr.,* argued the cause for respondent Town of Kearny (*Doyle & Brady,* attorneys).

The opinion of the court was delivered by

GAULKIN, P.J.A.D.

We hold here that a host community benefit in excess of the $1.00 per ton authorized by *N.J.S.A.* 13:1E–28 for a municipality having an approved sanitary landfill facility may not be imposed except upon a prior determination of the Board of Public Utilities (BPU) that the resultant rates charged to the landfill users are just and reasonable.

## I.

Hackensack Meadowlands Development Commission (HMDC) operates an approved sanitary landfill facility on a tract straddling the border between the Borough of North Arlington and the Town of Kearny. Pursuant to the Solid Waste Management Act (SWMA), *N.J.S.A.* 13:1E–1 *et seq.,* all of the municipalities of Hudson County are required to direct their solid waste to that facility, whose rates are regulated by BPU pursuant to the Solid Waste Utility Control Act of 1970 (SWUCA), *N.J.S.A.* 48:13A–1 *et seq. See, generally, A.A. Mastrangelo, Inc. v. Environmental Protec. Dep't.,* 90 *N.J.* 666 (1982).

As required by *N.J.S.A.* 13:1E–28, HMDC has paid to North Arlington and Kearny the equivalent of $1.00 per ton on all solid waste accepted for disposal at its landfill; by agreement between them, North Arlington receives 80% of those amounts and Kearny 20%. On July 7, 1988, North Arlington and Kearny filed with BPU a joint petition seeking an emergency increase in the host community benefit pursuant to *N.J.S.A.* 13:1E–28 "from the minimum $1.00 per ton to $10.00 per ton," effective January 1, 1988. The petitioners represented that in "[i]nformal contacts" HMDC "has expressed no objection" and urged that the increased benefit "is properly a 'surcharge' and does not require a rate hearing or notice to parties other than the HMDC."

Having learned informally of the pendency of the petition, appellants Robert Janiszewski, Hudson County Executive, the County of Hudson and the Hudson County Improvement Authority moved to intervene in the BPU proceedings. On October 26, while the petition and the motion were pending, HMDC held a public meeting at which it discussed the petition. After hearing public comment on behalf of the appellants and others, HMDC adopted its resolution 88–56 that

> [HMDC] supports the petition of North Arlington/Kearny before the Board of Public Utilities for an increase in host community benefits.

On November 14, BPU wrote to HMDC "to seek clarification" of the resolution:

> Please be advised that the Board views the amount of host community benefit, which is based upon agreement between the host community and the utility and which is in excess of the statutory minimum, as a non-reviewable surcharge, *N.J.S.A.* 13:1E–28. Accordingly, the Board seeks confirmation that the HMDC did vote to enter into an agreement with North Arlington and Kearny to provide those municipalities with a host community benefit of $10.00 as set forth in the petition. Once such confirmation is received, that amount will be added to rates as a surcharge without further review by the Board.

In response to that advice, HMDC met on December 8. After again hearing from objectors, HMDC adopted its resolution 88–68 that

> [HMDC] agrees to and supports the petition of North Arlington and Kearny before the Board of Public Utilities for a host community fee of eight dollars

for the Borough of North Arlington and two dollars a ton for the town of Kearny.

The resolution, however, set forth that the HMDC "does not support" making the increased benefit retroactive to January 1, 1988 but approved it "effective December 1, 1988."

On December 14, BPU entered an order accepting resolution 88–68 and directing HMDC "to file an appropriate revised tariff reflecting the agreed upon host community benefit surcharge." In entering that order, the Board recited that "it is not required to review the reasonableness of the amount to which the parties have agreed" and that "the Board does not pass on the amount of the benefit." The order also denied appellants' motion to intervene, on the ground that, since BPU would not review the amount of the host community benefit, the matter "is not a contested case requiring evidentiary hearings."

Appellants now challenge both HMDC resolutions and the BPU order. We stayed implementation of the BPU order, but allowed HMDC to collect $4.00 per ton from waste generators, $3.00 of which is retained in an interest-bearing fund pending disposition of the appeal.

## II.

The core question is how an increase in the host community fee may be implemented. *N.J.S.A.* 13:1E–28 is the focus of that inquiry:

a. Any municipality within which a sanitary landfill facility is located pursuant to an adopted and approved district solid waste management plan shall be entitled to an annual economic benefit not less than the equivalent of $1.00 per ton of solids on all solid waste accepted for disposal at the sanitary landfill facility during the previous calendar year as determined by the department.

The owner or operator of the sanitary landfill facility shall annually pay to the relevant municipality the full amount due under this subsection and each relevant municipality is empowered to anticipate this amount for the purposes of preparing its annual budget. For the purposes of calculating the payments, the owner or operator of the sanitary landfill facility may, subject to the prior agreement of the relevant municipality and the approval of the Board of Public Utilities, provide the municipality with any of the following benefits in consider-

ation for the use of land within its municipal boundaries as the location of a sanitary landfill facility:

(1) The receipt of annual sums of money in lieu of taxes on the land used for the sanitary landfill facility;

(2) The exemption from all fees and charges for the disposal of solid waste generated within its boundaries;

(3) The receipt of a lump sum cash payment; or

(4) An combination thereof.

b. Every owner or operator of a sanitary landfill facility required to make annual payments to a municipality pursuant to subsection a. of this section may petition the Board of Public Utilities for an increase, in its tariff which reflects these payments. The board, within 60 days of the receipt of the petition, shall issue an appropriate order that these payments shall be passed along to the users of the sanitary landfill facility as an automatic surcharge on any tariff filed with, and recorded by, the board for the solid waste disposal operations of the facility.

c. The board, within 60 days of the computation of any increase in a solid waste disposal tariff pursuant to subsection b. of this section, shall issue an appropriate order increasing current tariffs established pursuant to law for solid waste collection by an amount equal to the total amount of the increase in the relevant solid waste disposal tariff calculated pursuant to subsection b. of this section.

d. In issuing any order required by this section, the Board of Public Utilities shall be exempt from the provisions of *R.S.* 48:2–21.

All of the parties agree that the statute is intended to provide a mechanism by which the $1.00 per ton minimum benefit may be increased. Appellants contend that the statute should be read as requiring BPU to determine whether and to what extent an enhanced benefit is just and reasonable. BPU abjures any such responsibility and urges that its function is limited "to approving the calculation of payments in the presence of an agreement among the parties for a benefit greater than the statutory minimum."[1] BPU suggests that any

---

[1] BPU's position contradicts its own April 1, 1985 Order of Implementation entered upon the adoption of *N.J.S.A.* 13:1E–28. That order provides that "the method of payment and amount of any benefit must be approved by [BPU]" and establishes procedures designed to assure "that those affected by substantial landfill rate increases have a full and fair opportunity to be heard before such increases are put into effect." BPU has neither revoked nor implemented the order; in its brief it explains simply that it may "depart from or modify a previous position ... in order to effectuate a reasonable permissible policy."

claimed excessiveness of the benefit is remediable, if at all, in an action in lieu of prerogative writs "to challenge the underlying agreement among the municipalities and the HMDC." But HMDC also denies any responsibility to function as "a rate-setting entity with a duty to conduct inquiries into the reasonableness of the fee."[2] North Arlington and Kearny do not argue that either BPU or HMDC has any obligation to determine reasonableness, but urge that the actions of both BPU and HMDC were proper and sufficient to impose the $10.00 per ton benefit they agreed upon with HMDC.

The language of *N.J.S.A.* 13:1E–28 is unquestionably obscure. Although subparagraph (a) mandates that a host municipality shall receive "not less than the equivalent of $1.00 per ton," the balance of the statute does not clearly limn the procedure by which more than $1.00 can be received. While other interpretations might be available, the parties agree that subparagraph (a) first requires an agreement between the host community or communities and the landfill operator:[3]

> For the purposes of calculating the payments, the owner or operator of the sanitary landfill facility may, subject to the prior agreement of the relevant municipality and the approval of the Board of Public Utilities, provide the municipality with any of the following benefits in consideration for the use of

---

[2]At the October 26 HMDC meeting, the Chairman Villane observed that "whatever the BPU decides will be what the fee is ... the responsibility of setting that fee is with another agency and it should not be our responsibility." None of the Commissioners took exception to that statement, which was reaffirmed in a subsequent letter from Villane to appellant Janiszewski. We also note that the North Arlington–Kearny petition requested BPU to fix the benefit at $10.00. On this appeal, however, neither HMDC nor the municipalities urge that BPU has a role in fixing or regulating the host community benefit.

[3]North Arlington and Kearny took a different position before BPU. Their petition did not allege any agreement with HMDC and specifically reserved "the right to argue that [BPU] has separate authority to establish a benefit ... even absent an agreement with the landfill operator or, indeed, even in the face of opposition from one." We find it unnecessary in this case to consider what relief, if any, a host community might have from BPU in the absence of an agreement with the landfill operator.

land within its municipal boundaries as the location of a sanitary landfill facility.

*N.J.S.A.* 13:1E–28(a).

As that language makes clear, any such agreement can be effectuated only upon "approval" of BPU. In support of their view that BPU can only approve a benefit it finds just and reasonable, appellants argue that approval without consideration of the reasonableness of the proposed benefit would constitute arbitrary and capricious agency action and could violate constitutional prohibitions on "extortionate and arbitrary charges upon the public." *In re Intrastate Industrial Sand Rates,* 66 *N.J.* 12, 23–24 (1974). Since BPU has not only general rate-making authority (*N.J.S.A.* 48:2–21(b), (c), (d)) but also rate-making authority in the solid waste area (*N.J.S.A.* 48:13A–7), appellants urge that BPU has both the power and the duty to determine reasonableness of any proposed host community benefit presented to it for approval under *N.J.S.A.* 13:1E–28.

BPU, on the other hand, argues that calculation of a host community benefit is not "part of the ordinary rate-making process," which requires "calculation of a just and reasonable return on a utility's rate base." The host community benefit is but a "surcharge, to be added to the landfill's basic rate." BPU points to *N.J.S.A.* 13:1E–28(b) which directs that BPU "shall" order that payments fixed under subsection (a) "shall be passed along to the users of the sanitary landfill facility as an automatic surcharge on any tariff." Finally, BPU relies on *N.J.S.A.* 13:1E–28(d), which exempts any order made under the statute from the provisions of *N.J.S.A.* 48:2–21, where BPU's general rate-making responsibilities are set forth.

We find BPU's rationales unpersuasive. It is true that a host community benefit, designed to compensate a municipality for the burden associated with a landfill within its boundaries, cannot properly be evaluated through a rate-making process keyed to a reasonable return on a utility's rate base. The exemption of *N.J.S.A.* 13:1E–28 orders from the rate-making

provisions of *N.J.S.A.* 48:2–21 recognizes that fact. But BPU's role in the solid waste area is not limited to traditional rate-making.

BPU's solid waste responsibilities were imposed in 1970 by the enactment of the SWUCA. The Legislature there declared that the handling of solid waste "is a matter of grave concern to all citizens and ... thoroughly affected with the public interest." *N.J.S.A.* 48:13A–2. BPU accordingly was "charged with the duty of setting and enforcing standards and rates for regulating economic aspects of solid waste collection, disposal and utilization service." *Id.* BPU was empowered to make rules, regulations and orders "for the regulation of rates and public utility aspects of the solid waste collection industry and the solid waste disposal industry." *N.J.S.A.* 48:13A–4. BPU was also given authority, "upon complaint or its own initiative," to direct "any person engaging in the ... solid waste disposal business to furnish proof that the charges or rates to be received for such service do not exceed just and reasonable rates or charges for such service." *N.J.S.A.* 48:13A–7(a). If BPU finds that the "rates or charges are excessive," it may order "an adjustment in the contract to a sum which shall result in just and reasonable rates or charges." *N.J.S.A.* 48:13A–7(b).

The broad authority granted to BPU by the SWUCA should not be given a cramping construction. As the Supreme Court observed in *In Re Application of Saddle River*, 71 *N.J.* 14 (1976), the legislature "departed to some extent from the traditional concept of a public utility" by expanding its definition "to meet the requirements of an increasingly complex and interdependent society." *Id.* at 21. In *Saddle River* the Court considered whether SWUCA's authority over solid waste collectors excused a municipality from soliciting bids for solid waste collection contracts. Rejecting the municipality's contention that competitive bidding and public regulation cannot coexist, the Court found that the SWUCA gave BPU rights beyond those it exercised in regulating traditional utilities. Thus, with

respect to solid waste collection contracts, BPU "may rely on the interactions of the market place to give rise to reasonable rates" but where such "competitive protection fails, [BPU] ... may require the contractor to demonstrate the reasonableness of its rates." *Id.* at 25–26.

*Saddle River* makes clear that BPU's role under the SWUCA is more extensive and more flexible than its role with traditional utilities.[4] The mandate imposed on BPU to set and enforce standards and rates "for regulating economic aspects of solid waste ... disposal" (*N.J.S.A.* 48:13A–2) would be critically compromised if BPU did not have authority to determine the reasonableness of *N.J.S.A.* 13:1E–28 host community benefits. Here, for example, an increase in the host community fee from its present $1.00 to its proposed $10.00 portion would visit on the municipalities of Hudson County additional disposal charges totalling approximately $9.2 million. BPU would lose substantial control over the economic aspects of solid waste disposal if those additional charges could be imposed solely by agreement between the host municipalities and HMDC.[5]

We are thus thoroughly persuaded that the required BPU "approval" of an increased host community benefit contemplates a determination by BPU, in keeping with its obligations under the SWUCA, that the benefit and the resultant charges to the landfill users are just and reasonable. Once the amount of the benefit and the form of its rendition have been

---

[4]For another judicial finding of BPU authority to act beyond its traditional role in regulating a newly-defined public utility, see *NYT Cable TV v. Homestead At Mansfield, Inc.,* 214 *N.J.Super.* 148 (App.Div.1986), aff'd 111 *N.J.* 21 (1988) (BPU has authority to fix just compensation for taking of private property to accommodate cable television lines).

[5]The $10.00 figure agreed to by North Arlington–Kearny and HMDC surely does not represent "interactions of the market place" (*Saddle River,* 71 *N.J.* at 25), since (1) *N.J.S.A.* 13:1E–28 permits HMDC to pass onto its users any approved increase in the host community benefit and (2) the users are foreclosed by administrative orders from directing their waste to any other facility.

approved by BPU under *N.J.S.A.* 13:1E–28(a) then, on applica-
tion of the landfill operator, BPU must issue an order under
*N.J.S.A.* 13:1E–28(b) permitting the payments to "be passed
along to the users." As provided by *N.J.S.A.* 13:1E–28(d), BPU
need not pursue the traditional rate-making standards and
procedures described in *N.J.S.A.* 48:2–21. Nor will we presume
to fix standards or procedures for BPU to follow in determining
whether to grant its "approval" under *N.J.S.A.* 13:1E–28(a).
BPU is best able to decide, at least in the first instance, how
best to address such questions. *Cf. Princeton Cablevision,
Inc. v. Union Valley Corp.*, 195 *N.J.Super.* 257, 271 (Ch.Div.
1983).

### III.

Our holding mandates a remand of the BPU proceed-
ings for reconsideration of the host community benefit agree-
ment consistent with this opinion. Appellants argue, however,
that the agreement itself is tainted because of misconduct by
HMDC in adopting the December 8, 1988 resolution. We find
the contention clearly without merit. *R.* 2:11–3(e)(1)(E). The
personal interests of two HMDC commissioners as residents of
North Arlington and Kearny are not sufficient to require their
recusal, particularly in light of our holding that BPU has the
duty to determine the reasonableness of the host community
benefit. *Cf. Kramer v. Bd. of Adjust., Sea Girt*, 45 *N.J.* 268,
282 (1965); *Van Itallie v. Franklin Lakes*, 28 *N.J.* 258, 266–69
(1958). And our *in camera* review of the transcript of the
closed portion of the December 8 hearing satisfies us that the
ensuing resolution was not adopted in violation of the Open
Public Meetings Act, *N.J.S.A.* 10:4–6 *et seq.*

### IV.

The December 14, 1988 BPU order accepting HMDC
resolution 88–68 is reversed. The matter is remanded to BPU
for proceedings consistent with this opinion. During the pend-

ency of those proceedings and until further order of this court, HMDC may continue to collect $4.00 per ton from waste generators, $3.00 of which shall be retained in the interest-bearing fund.  Except to that extent, we do not retain jurisdiction.