NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3939-18

IN THE MATTER OF THE
IMPLEMENTATION OF L. 2018,
C. 16 REGARDING THE
ESTABLISHMENT OF A ZERO
EMISSION CERTIFICATE
PROGRAM FOR ELIGIBLE
NUCLEAR POWER PLANTS,

and

APPLICATION FOR ZERO
EMISSION CERTIFICATES OF
SALEM 1 NUCLEAR
POWER PLANT,

APPLICATION FOR ZERO
EMISSION CERTIFICATES OF
SALEM 2 NUCLEAR
POWER PLANT,

APPLICATION FOR ZERO
EMISSION CERTIFICATES OF
HOPE CREEK NUCLEAR
POWER PLANT.
_____

> APPROVED FOR PUBLICATION
>
> **March 19, 2021**
>
> **APPELLATE DIVISION**

Argued December 9, 2020 – Decided March 19, 2021

Before Judges Whipple, Rose, and Firko.

On appeal from the New Jersey Board of Public
Utilities, Docket Nos. EO18080899, EO18121338,
EO18121339 and EO18121337.

Stefanie A. Brand, Director, argued the cause for intervenor-appellant New Jersey Division of Rate Counsel (Stefanie A. Brand, attorney; Stefanie A. Brand, Brian O. Lipman, Litigation Manager, and Sarah H. Steindel, Assistant Deputy Rate Counsel, on the briefs).

David Chester Apy, Assistant Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Alex Moreau, Deputy Attorney General, on the brief).

Christopher S. Porrino argued the cause for intervenors-respondents Public Service Enterprise Group Incorporated and PSEG Nuclear, LLC (Lowenstein Sandler, LLP, attorneys; Christopher S. Porrino, Peter Slocum, Tamara Linde, Grace H. Park, Aaron I. Karp, and Joseph Accardo, Jr., on the brief).

Steven S. Goldenberg argued the cause for intervenor-respondent New Jersey Large Energy Users Coalition (Giordano, Halleran & Ciesla, PC, attorneys; Steven S. Goldenberg, of counsel and on the brief).

George C. Jones argued the cause for intervenor-respondent PJM Power Providers Group (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Joseph P. LaSala, of counsel; George C. Jones, on the brief).

Matthew M. Weissman, attorney for intervenor-respondent Public Service Electric and Gas Company; Cozen O'Connor, PC, attorney for intervenor-respondent Jersey Central Power & Light Company; and Philip J. Passanante, attorney for intervenor-respondent Atlantic City Electric Company (Matthew

M. Weissman, Gregory Eisenstark, and Philip J. Passanante, on the joint brief).

Day Pitney, LLP, Jeanne J. Dworetzky (Exelon Generation Company, LLC) of the District of Columbia bar, admitted pro hac vice, and Matthew E. Price (Jenner & Block, LLP) of the District of Columbia and Massachusetts bars, admitted pro hac vice, attorneys for intervenor-respondent Exelon Generation Company, LLC (Christopher John Stracco, Jeanne J. Dworetzky, Matthew E. Price, and Andrew J. Lichtman, on the brief).

Carlin & Ward, PC and Jeffrey W. Mayes (Monitoring Analytics, LLC) of the Pennsylvania, Virginia, and District of Columbia bars, admitted pro hac vice, attorneys for intervenor-respondent Monitoring Analytics, LLC (Michael J. Ash and Jeffrey W. Mayes, of counsel and on the brief).

Szaferman, Lakind, Blumstein & Blader, PC, attorneys for amicus curiae AARP (Janine G. Bauer, on the brief and Evelyn Liebman).

Connell Foley, LLP, and Ann Brewster Weeks (Clean Air Task Force) of the Massachusetts bar, admitted pro hac vice, attorneys for amicus curiae Clean Air Task Force (Thomas S. Cosma and Ann Brewster Weeks, on the brief).

Richard M. Pescatore, PC, and Bethany A. Davis Noll (Institute for Policy Integrity) of the New York bar, admitted pro hac vice, attorneys for amicus curiae Institute For Policy Integrity (Jennifer Carlson and Bethany A. Davis Noll, on the brief).

Sills Cummis & Gross, PC, attorneys for amicus curiae Nuclear Energy Institute, Inc. (Peter G. Verniero and Michael S. Carucci, of counsel and on the brief).

A-3939-18

The opinion of the court was delivered by

WHIPPLE, J.A.D.

In 2007, the New Jersey Legislature passed the Global Warming Response Act, N.J.S.A. 26:2C-37 to -68, having declared that it was in the State's interest to reduce greenhouse gas emissions by eighty percent by 2050. In furtherance of that goal, in 2018 the Legislature enacted a Zero Emission Certificate (ZEC) program for eligible nuclear power plants, L. 2018, c. 16, codified at N.J.S.A. 48:3-87.3 to -87.7 (the ZEC Act). The purpose of the ZEC Act is to subsidize nuclear power plants at risk of closure, helping them to remain operational despite competition from other carbon-emitting power sources, in the interest of New Jersey's clean energy goals. The Board of Public Utilities (the Board) administers the ZEC program, reviews applications, and selects eligible nuclear power plants to receive ZECs.

The Board considered ZEC applications from the Salem 1, Salem 2 and Hope Creek nuclear power plants located in Salem County. Following an extensive review of the applications, including voluminous confidential financial information about the nuclear power plants' costs and revenues, certifications that the plants would shut down in three years absent a material financial change, as well as consideration of thousands of public comments, the Board determined that all three applicants satisfied the five statutory

eligibility criteria codified at N.J.S.A. 48:3-87.5(e) and should receive ZECs. In this appeal, we address challenges to the Board's decision. Because the Board's decision is adequately supported by the record and consistent with both the ZEC Act's plain language and the legislative intent, we affirm.

I.

Significant ZEC subsidy costs are ultimately passed on to consumers; thus, the New Jersey Division of Rate Counsel (Rate Counsel) appealed the Board's decision, arguing it was arbitrary, capricious, or contrary to law for various reasons. Rate Counsel contended none of the nuclear power plants need ZECs to remain financially viable and therefore do not satisfy the third statutory eligibility criterion. Rate Counsel advanced other general challenges to aspects of the Board's findings and conclusions, asserting the Board did not interpret certain aspects of the ZEC Act correctly, and further argued that the Board ignored its responsibility to ensure that the $0.004-per-kilowatt-hour charge mandated in the ZEC Act to fund the ZEC program was just and reasonable.

Rate Counsel was an intervenor before the Board based upon its statutory authority to represent and protect the public interest. N.J.S.A. 52:27EE-48(a). Respondent Monitoring Analytics, LLC (Monitoring Analytics), also an intervenor, is the Independent Market Monitor (IMM) for

5

PJM Interconnection, LLC.[1]  In its role as IMM, Monitoring Analytics objectively monitors the competitiveness of PJM's markets.

Numerous other stakeholders participated before the Board and in this appeal.  Respondent Exelon Generation Company, LLC (Exelon) participated as co-owner of the Salem 1 and Salem 2 nuclear power plants with respondent PSEG Nuclear, LLC (PSEG Nuclear).  PSEG Nuclear is the sole owner of the Hope Creek nuclear power plant and has the sole and exclusive authority to make decisions regarding the retirement of all three plants.  PSEG Nuclear submitted ZEC applications to the Board for Salem 1, Salem 2, and Hope Creek.

Respondents Public Service Electric and Gas Company (PSE&G), Jersey Central Power & Light Company (JCP&L), and Atlantic City Electric Company (ACE), are investor-owned electric distribution companies (EDCs).

Respondent PJM Power Providers Group (P3) is a nonprofit organization of power providers whose mission is to promote properly designed and well-functioning competitive wholesale electricity markets in the region served by

---

[1]  PJM Interconnection, LLC (PJM) manages the regional, high-voltage electricity grid serving all or parts of thirteen states including New Jersey and the District of Columbia, operates the regional competitive wholesale electric market, manages the regional transmission planning process, and establishes systems and rules to ensure that the regional and in-state energy markets operate fairly and efficiently.  N.J.S.A. 48:3-51.

PJM. Respondent New Jersey Large Energy Users Coalition (NJLEUC) is an association of large volume electric customers.

We also granted AARP, Nuclear Energy Institute, Inc. (NEI), Institute for Policy Integrity (IPI) and Clean Air Task Force leave to file amicus briefs.

## II.

As a subsidy promoting nuclear power, a ZEC is "a certificate, issued by the [B]oard or its designee, representing the fuel diversity, air quality, and other environmental attributes of one megawatt-hour of electricity generated by an eligible nuclear power plant selected by the [B]oard to participate in the program." N.J.S.A. 48:3-87.4. To be deemed eligible by the Board, a nuclear power plant must meet the following five criteria:

> (1) be licensed to operate by the United States Nuclear Regulatory Commission by the date of enactment of this Act and through 2030 or later;
>
> (2) demonstrate to the satisfaction of the [B]oard that it makes a significant and material contribution to the air quality in the State by minimizing emissions that result from electricity consumed in New Jersey, it minimizes harmful emissions that adversely affect the citizens of the State, and if the nuclear power plant were to be retired, that that retirement would significantly and negatively impact New Jersey's ability to comply with State air emissions reduction requirements;
>
> (3) demonstrate to the satisfaction of the [B]oard, through the financial and other confidential information submitted to the [B]oard pursuant to

7

subsection a. of this section, and any other information required by the [B]oard, . . . that the nuclear power plant's fuel diversity, air quality, and other environmental attributes are at risk of loss because the nuclear power plant is projected to not fully cover its costs and risks, or alternatively is projected to not cover its costs including its risk-adjusted cost of capital, and that the nuclear power plant will cease operations within three years unless the nuclear power plant experiences a material financial change;

(4) certify annually that the nuclear power plant does not receive any direct or indirect payment or credit [from the state, federal government, or regional compact] . . . despite its reasonable best effort to obtain any such payment or credit, for its fuel diversity, resilience, air quality or other environmental attributes that will eliminate the need for the nuclear power plant to retire, except for any payment or credit received under the provisions of this act; and

(5) submit an application fee to the [B]oard in an amount to be determined by the [B]oard, but which shall not exceed $250,000, to be used to defray the costs incurred by the [B]oard to administer the ZEC program.

[N.J.S.A. 48:3-87.5(e).]

The central issue in this appeal is the satisfaction of the third statutory criterion, financial eligibility. ZEC applicants must provide the Board with extensive financial information about the nuclear power plant,

including, but not limited to, certified cost projections over the next three energy years, including operation and maintenance expenses, fuel expenses, including spent fuel expenses, non-fuel capital expenses, fully allocated overhead costs, the costs of operational risks

8

and market risks that would be avoided by ceasing operations, and any other information, financial or otherwise, to demonstrate that the nuclear power plant's fuel diversity, air quality, and other environmental attributes are at risk of loss because the nuclear power plant is projected to not fully cover its costs and risks, or alternatively is projected to not fully cover its costs and risks including its risk-adjusted capital.

[N.J.S.A. 48:3-87.5(a).]

For purposes of this subsection, operational risks include, but are not limited to, the risk that operating costs will be higher than anticipated because of new regulatory mandates or equipment failures and the risk that per-megawatt-hour costs will be higher than anticipated because of a lower than expected capacity factor. Market risks include, but are not limited to, the risk of a forced outage and the associated costs arising from contractual obligations, and the risk that output from the nuclear power plant may not be able to be sold at projected levels. Id.

Applicants must also include a certification that the nuclear power plant will cease operations within three years unless the nuclear power plant experiences a material financial change; the certification shall specify the necessary steps required to be completed to cease the nuclear power plant's operations.

A-3939-18

The ZEC Act contains a confidentiality provision [2] to protect the information submitted by ZEC applicants and mandates procedural timelines for establishment of the ZEC program by the Board, submission of ZEC applications and selection of eligible nuclear plants to receive ZECs, all of which were met. N.J.S.A. 48:3-87.5(b), (c), (d).

The selected nuclear power plants must certify annually that they remain eligible for ZECs pursuant to the ZEC Act's requirements. N.J.S.A. 48:3-87.5(h)(2), (3). For the first energy year, the eligible nuclear power plant receives a number of ZECs equal to the number of megawatt-hours of electricity it produced in that energy year starting on the date the Board selected it. N.J.S.A. 48:3-87.5(g)(2). For each subsequent energy year, the eligible nuclear power plant receives a number of ZECs equal to the number of megawatt-hours of electricity that it produced in that energy year. Ibid.

---

[2] During the Board proceedings, the Attorney General and the Board approved the requests by intervenors for access to confidential information in the record, including the three ZEC applications, pursuant to N.J.S.A. 48:3-87.5(a), upon determining that both parties were "essential to aid the Board in making the applicable determinations under the [ZEC] Act" and that the disclosure would not harm competition. None of the other parties were granted access to any of the confidential information. Consequently, the Board issued two versions of its order, decision, and attachments thereto: a public version and a confidential version. Rate Counsel, Exelon, and PSEG Nuclear filed public and confidential versions of their appellate briefs and appendices. Our decision is based on the confidential record.

The ZEC Act requires the Board to determine the price of a ZEC for each energy year:

> by dividing the total number of dollars held by electric public utilities in the accounts established pursuant to paragraph (1) of subsection j. of this section at the end of the prior energy year by the greater of: [forty] percent of the total number of megawatt-hours of electricity distributed by the electric public utilities in the state in the prior energy year, or the number of megawatt-hours of electricity generated in the prior energy year by the selected nuclear power plants.
>
> [N.J.S.A. 48:3-87.5(i)(1).]

The ZEC Act further requires EDCs to purchase ZECs on a monthly basis from each selected nuclear power plant with payment to follow within ninety days after the conclusion of the first energy year in which selected nuclear power plants receive ZECs, and within ninety days after the conclusion of each subsequent energy year. N.J.S.A. 48:3-87.5(i)(2). The total number of ZECs that each EDC is required to purchase is equal to the total number of ZECs received by the selected nuclear power plants for the prior energy year, multiplied by the percentage of electricity distributed in the State by the electric public utility as compared to other electric public utilities in New Jersey. Id.

This purchase is funded through a charge imposed on retail customers. N.J.S.A. 48:3-87.5(j)(1). The ZEC Act requires EDCs to file a tariff to recover

from its retail distribution customers a charge in the amount of $0.004 per kilowatt-hour, which reflects the emissions avoidance benefits associated with the continued operation of selected nuclear power plants. Following an opportunity for comment, public hearing and the Board's approval, the revenue collected from the charge is held in a separate, interest-bearing account used solely to purchase ZECs. Any excess money in that account at the end of each energy year is refunded to customers. N.J.S.A. 48:3-87.5(j)(2). The ZEC Act also contains refund mechanisms triggered by a nuclear power plant's cessation of operations despite having received ZECs. N.J.S.A. 48:3-87.5(k).

In order to ensure that the ZEC program remains affordable to New Jersey retail distribution customers, and notwithstanding the provisions of N.J.S.A. 48:3.87.5(j)(1), the Board may reduce the $0.004-per-kilowatt-hour charge at certain times, and under certain circumstances set forth in N.J.S.A. 48:3-87.5(j)(3)(c). For example, the Board may reduce the charge if it does not certify any nuclear power plants for a subsequent eligibility period upon determining that a reduced charge will nonetheless be sufficient to achieve the state's air quality. This would meet other environmental objectives by preventing the retirement of the nuclear power plants that meet the eligibility criteria established pursuant to subsections (d) and (e).

12

On August 29, 2018, the Board initiated the ZEC program, with a vigorous application and review process. The Board created an Eligibility Team (ET) to evaluate and rank the applications based upon the five criteria set forth in the ZEC Act and stated its intent to hire a consultant to assist its staff. It determined that after the initial three-year award of ZECs to a unit, it would evaluate the set kilowatt-hour charge established by the ZEC Act and modify that amount if necessary, pursuant to N.J.S.A. 48:3-87.5(j)(3).

The Board issued orders accepting the tariffs filed by EDCs for the recovery of the ZEC charges from their customers but directed that the tariffs not be implemented unless and until the Board issues a final order authorizing the EDCs to implement the ZEC program. The Board selected Levitan & Associates, Inc. (Levitan) as a consultant to assist its staff with evaluation and ranking of the ZEC applications.

IV.

With these procedures in place, on December 19, 2018, PSEG Nuclear submitted ZEC applications for Salem 1, Salem 2 and Hope Creek. Applicants each submitted a confidential application designed to elicit information that tracked the statutory eligibility criteria, which included: I. General Applicant Information; II. Generation Asset Information and Operation; III. Zero

Emission Credit Justification – Financial; IV. Zero Emission Credit Justification – Environmental; V. Impact of the Unit's Deactivation; and VI. Miscellaneous. Section VII sought thirty-eight supplemental submissions from each applicant, including a certification that the nuclear power generation unit will cease operations within three years unless the nuclear power plant experiences a material financial change. The information sought from applicants in Section III of the application pertained to projected costs and is especially relevant to the issues raised on appeal. The first category of information sought:

> [C]ertified cost projections over the next three (3) energy years, including operation and maintenance expenses; fuel expenses, including spent fuel expenses; on-fuel capital expenses; fully allocated overhead costs; the costs of operational risks and market risks that would be avoided by ceasing operations to demonstrate that the plant is projected to not fully cover its costs and risks, or alternatively is projected to not fully cover its costs and risks, including its cost of capital, or alternatively its risk-adjusted cost of capital.

The second category required applicants to:

> Demonstrate that the unit is financially unviable, i.e., if the unit's revenue and funding outweighs the avoided costs expenses (operations, training, engineering, materials, fuel, etc.) of the unit, for each year through 2030. Provide all backup documentation.

14

Because Rate Counsel does not contend on appeal that the applicants failed to satisfy all of the eligibility criteria, we limit our discussion to those aspects of the applications pertaining to the third eligibility criterion, codified at N.J.S.A. 48:3-87.5(e)(3), financial viability.

The applicants' cost projections included the following categories of expenses: labor and materials, outside services such as contractors and maintenance, real estate taxes, support services such as accounting, human resources, etc., fully allocated corporate overhead, spent fuel, working capital, fuel and non-fuel capital expenditures, regulatory and other fees and expenses, operational risks and market risks. Their revenue projections included energy, capacity, and ancillary revenue.

Rate Counsel asserted the applicants are financially viable without ZECs because the applicants improperly included operational risks, market risks, spent fuel costs, certain support service and overhead costs and certain capital expenditures in their cost projections. Thus, we focus on these five categories and how the Board reviewed them.

1. Operational Risks

For each applicant, PSEG Nuclear included "a cost of operational risk in its financial evaluation equal to ten percent of total costs, which is consistent with operating cost estimation rules adopted in the [Federal Energy Regulatory

Commission]-approved PJM tariff." PSEG Nuclear explained that the cost of operational risk for each plant included potential regulatory mandates, equipment failures and attendant outages for repairs.

Addressing regulatory mandates, PSEG Nuclear asserted that nuclear plants are subject to stringent safety- and security-focused regulatory oversight by the United States Nuclear Regulatory Commission (NRC), and can face significant unseen regulatory requirements at any time, such as recent orders issued by the NRC after a 2011 "nuclear event" in Japan that required all United States nuclear plants to upgrade their facilities. These upgrades cost Salem 1, Salem 2 and Hope Creek approximately $105 million. Security requirements after the September 11, 2001, terrorist attacks cost Salem 1, Salem 2 and Hope Creek approximately $140 million.

PSEG Nuclear cited unexpected expenditures in 2008 at Salem 1 of approximately $266 million. In addition, PSEG Nuclear asserted that the cumulative impact of even relatively modest capital projects required to address unforeseeable equipment failure issues can be significant. It also asserted that unexpected outages for repairs not only increase the total unit costs but can also dramatically increase the per-megawatt-hour cost, and that such outages can be prolonged.

16

## 2. Market Risks

For each applicant, PSEG Nuclear included the cost of market risks in its projections at a rate of $4.2/megawatt hours for Hope Creek and Salem 1, and $4.3/megawatt hours for Salem 2. PSEG Nuclear divided its market risks into two categories:  forced outage risk and price volatility risk.  In each application, PSEG Nuclear explained that forced outage risk is:

> that actual generation will fall short of forecasted generation, resulting in lower than expected revenues or a mismatch between previously contracted sales and actual generation so that the generation owner will have to "cover" its contracted sales during outages by purchasing energy in the spot market at prices potentially much higher than the contracted price – or hedged price.

It further explained that price volatility risk is the risk that the forecasted generation output from the nuclear power plant may not be able to be sold at projected prices – or forward prices.

To assess each applicant's market risks, PSEG Nuclear utilized an energy risk modeling software application, Lacima Analytics.  It explained how it used the same software application, inputs, and modeling approach that it uses in the ordinary course of business to assess market risk for its entire portfolio. In keeping with its normal business practice to assess and manage portfolio market risk at the ninety-five-percent confidence level, PSEG Nuclear used that same level to assess the cost of market risks in each application.

17

3.  Spent Fuel Costs

Spent fuel costs arise from a charge imposed by the United States Department of Energy (DOE) on nuclear plants for the costs of fulfilling its legal obligation to dispose of the nuclear fuel used to generate power.  Because this charge was most recently assessed at a rate of $0.955 per megawatt-hour, that rate was used in each applicant's cost projections.

When the federal Yucca Mountain Nuclear Waste Repository was defunded, this fee was suspended, at which point PSEG Nuclear ceased accruing for that expense in its financial statements.  It explained that it nonetheless included spent fuel costs in its cost projections because DOE still has a legal obligation to dispose of nuclear fuel and will need to pay for the costs of whatever that ultimate solution is through a fee on nuclear generators.

4.  Support Services and Overhead Costs

For each applicant, PSEG Nuclear included support services and fully allocated overhead in its cost projections, which represented:

> [A]ccounting, legal, communications, procurement, human resources, information technology, treasury and financial, investor relations, stockholder services, real estate, insurance, risk management, tax, security and claims, corporate secretarial and certain planning, budgeting, forecasting services, and general administrative expenses and other corporate overhead costs.

A-3939-18

## 5. Capital Expenditures

For each applicant, PSEG Nuclear included fuel and non-fuel capital expenditures in its cost projections. It described fuel capital expenditures as the fuel capital expenditures associated with refueling outages and non-fuel capital expenditures as spending on long-lived plant equipment required to maintain safe and reliable operations.

The Board considered comments from Rate Counsel, Monitoring Analytics, P3 and NJLEUC, among others, on the applications, along with reply comments from PSEG Nuclear and others. Rate Counsel contended the applicants' financial projections overstated costs and understated revenues. The comments also focused upon the $2.9 billion in "stranded costs" previously paid by ratepayers for the nuclear units as a result of electric public utility deregulation in 1999 and asserted that the Board was required to determine not only whether a ZEC is warranted, but also whether the rate set forth in the statute is just and reasonable.

The comments pertaining to overstated costs and understated revenues echoed the findings of Rate Counsel's experts, who submitted two certifications. First, a certification from Andrea Crane, president of the Columbia Group, Inc., a consulting firm specializing in utility regulation, primarily addressed the applicants' overstated costs. A certification from Bob

A-3939-18

Fagan and Maximilian Chang of Synapse Energy Economics (Synapse), a consulting firm that provides economic and expert advice to public interest clients on electricity matters, primarily addressed the applicants' understated revenues.

These experts both criticized the methodologies used by PSEG Nuclear to assess the financial viability of each plant and conducted independent assessments in which they eliminated the assumption of operational and market risks from the financial projections. With those categories excluded entirely, they opined that each plant would be financially viable for the next three years and that, therefore, none of the applicants qualified for the ZEC program.

Rate Counsel argued PSEG Nuclear's financial projections pertaining to costs for each applicant were flawed because the methodologies used for forecasting operational and market risks were speculative and unverifiable, and because PSEG Nuclear included capital expenditures as "costs" and included improper and inflated operational costs such as spent fuel, support services, and overhead costs. Rate Counsel and Crane acknowledged that PSEG Nuclear's estimates may be the best indicator of expected future costs but nonetheless maintained that this approach placed an unreasonable burden on ratepayers.

As to PSEG Nuclear's market risks methodology, Rate Counsel and Crane asserted that it virtually guaranteed the claimed "cost" will cover all contingencies despite the fact the ZEC Act does not provide for ratepayers to be guarantors for all possible contingencies relating to market risks. They urged the Board to consider the history of these deregulated units and the fact that they have earned profits significantly higher than anticipated since deregulation occurred approximately twenty years ago.

Rate Counsel and Crane also argued the cash flow approach utilized by PSEG Nuclear violates a basic accounting principle that costs which provide a benefit over multiple years should be recovered over a multi-year period. The cash flow approach burdens ratepayers by funding one hundred percent of capital expenditures for these supposedly unregulated entities, but provides no right to benefit from any excess returns on those investments.

Rate Counsel and Crane objected to the inclusion of spent fuel costs since the spent fuel charge for Yucca Mountain was suspended in May 2014. They also claimed that the variable portion of the support services and overhead costs which PSEG Nuclear included was inflated and it was unlikely that most of these costs will go away if the nuclear units are shut down.

Citing the Synapse certification, Rate Counsel contended that PSEG Nuclear understated each applicant's energy price projections and capacity

price projections and failed to account for other sources of revenue. They argued recent actual energy prices were higher than those projected by the applicants and that the applicants failed to look at future natural gas prices, which are generally viewed as a good indication of where future energy prices will fall, and failed to analyze the price impacts if only one or two of the units shuts down, rather than all three.

In further support of its objection to the ZEC program, Rate Counsel discussed the 1999 enactment of the Electric Discount and Energy Competition Act (EDECA), N.J.S.A. 48:3-49 to -98, which mandated the restructuring of the electric and natural gas industry in order to lower prices through competition. Overall, Rate Counsel contended that the historical impact of the EDECA and the restructuring process on ratepayers should be considered by the Board in connection with the ZEC applications.

During restructuring under the EDECA, electric companies divested most of their generation fleets but continued to transmit and deliver power to customers. The divestitures created "stranded costs" because the value of some plants on a utility's books was higher than what the electric utility received when divesting its asset. PSE&G had divested its ownership share of Salem 1, Salem 2 and Hope Creek to its affiliate. Rate Counsel asserted that the affiliate assumed the risks of ownership and operation of the nuclear plants

22

as part of this transaction, which allowed it to earn unregulated returns on the assets being transferred. According to Rate Counsel, PSE&G already recovered approximately $2.9 billion in stranded costs from ratepayers, which included costs from the nuclear plants and other fossil fuel plants that it divested.

Finally, Rate Counsel's comments also addressed the reasonableness of the $0.004-per-kilowatt-hour charge mandated in the ZEC Act, claiming the Board has an obligation to determine not only whether a ZEC is warranted, but also whether the rate set forth in the statute is just and reasonable pursuant to a different statute, N.J.S.A. 48:2-21(b). It criticized the Act for failing to explain how the charge was calculated and contended that the Board should interpret the ZEC Act in pari materia with N.J.S.A. 48:2-21(b), a public utilities statute concerning ratemaking. Rate Counsel further contended that unless the Board finds that a nuclear plant's application demonstrates that the $0.004 rate is just and reasonable, the Board must either deny the ZEC in its entirety or approve some lesser amount.

Monitoring Analytics's comments echoed Rate Counsel's assertions of overstated costs, understated revenues and that none of the units required subsidies. P3 agreed with Rate Counsel and Monitoring Analytics that the applicants' nuclear plants are highly profitable and do not need ZECs. It also

23

noted several pending PJM market reforms that could lead to additional revenue for the applicants, asserting that if New Jersey rejoins the Regional Greenhouse Gas Initiative (RGGI), power prices will increase and nuclear units will make an additional thirty to seventy million dollars a year in profits. P3 maintained that abandoning the competitive market, and awarding unnecessary ZECs, will make New Jersey's high electricity rates even higher and agreed with Rate Counsel and Monitoring Analytics that, ultimately, the Board should reject the ZEC applications. To support its position, P3 submitted a sworn affidavit from its expert, Paul M. Sotkiewicz, PhD, President and Founder of E-Cubed Policy Associates, LLC, and former Chief Economist in the Market Service Division of PJM Interconnection, LLC.

NJLEUC also contended that the ZEC program will have a detrimental effect on large businesses in the State, which consume a much greater number of kilowatt hours of electricity than residential customers. Based upon a poll of its member businesses, it argued that the average cost of the ZEC program to large businesses will be $570,000 per year.

On April 17, 2019, the ET, which consisted of Board staff, New Jersey Department of Environmental Protection (NJDEP) staff, and the Board consultant, Levitan, submitted three memoranda to the Board that addressed each applicant's eligibility for ZECs. The ET submitted two other documents

24

with each memorandum that it had reviewed, incorporated, and relied upon to support its recommendations:  the Application Eligibility Report from Levitan, and a memorandum from NJDEP addressing the applicants' environmental eligibility under the second statutory criterion.

The ET found all three applications were complete, and based on the submitted applications, each applicant had satisfied the first, fourth, and fifth statutory criteria since:  (1) each unit was licensed to operate beyond 2030; (2) each unit has not and was not currently receiving any other subsidies; and (3) each applicant paid the requisite application fee.  Thus, the ET determined that eligibility for ZECs came down to the environmental and financial determinations, the second and third statutory criteria.

Overall, the ET found that the closing of each unit would require the use of substitute capacity resources to supplement PSEG Nuclear's committed energy in the three-year ahead capacity market and that solar and wind energy resources could not replace the base load from the nuclear units. Consequently, the supplemental energy would most likely come from natural gas-fired plants within PJM and quite possibly from its own inventory. NJDEP agreed in its memo that, within the three-year study period, replacement generation would come from existing fossil-fuel-fired facilities.

The ET determined that closure of Salem 1, Salem 2, and Hope Creek will have a negative impact on air quality in New Jersey based on increased emissions, including harmful emissions, from electric-generating sources, and will not significantly and negatively impact New Jersey's ability to comply with 2020 Global Warming requirements, but may make New Jersey's ability to comply with 2050 Global Warming requirements more challenging and would likely make New Jersey's ability to comply with ozone air quality standards more challenging.

However, the ET agreed with Rate Counsel, Monitoring Analytics, and P3 that a unit's avoidable costs is the proper focus of the evaluation of the unit's financial viability under the ZEC Act. It noted that in other proceedings, the Board has supported a net avoidable cost rate as an appropriate measure of a generator's competitive offer into the markets.

The ET excluded one-half of projected labor costs, one-half of projected non-labor costs and all projected spent fuel costs from PSEG Nuclear's cost projections for each applicant. It cited Levitan's analysis and concluded that because the cost of handling spent fuel is not a true cost that is incurred, it is not a cost that would be avoided by ceasing operations. After making various adjustments to the applicants' cost projections, the ET concluded that all three

units would operate profitably through May 2022 and would therefore not need to cease operations within the next three years.

The Board did not agree and on April 18, 2019, determined that the applicants had satisfied the ZEC Act's eligibility criteria to receive ZECs. In Sections I and II of its comprehensive decision, the Board summarized the matter's background and procedural history. And in Section III, the Board summarized the commenters' respective positions, along with PSEG Nuclear's reply thereto.

In its decision, the Board outlined the eligibility process, incorporated the majority of the ET's findings, and summarized the ET's determination on the applications. The Board analyzed the ET's six key determinations pertaining to the third criterion, financial eligibility, as follows:

> [1] The market and operational "risks" included by PSEG [Nuclear] (and Exelon as part owner for Salem 1 and 2) in the applications should be excluded. These "risks" are planning projection tools used by the applicant and are not true "costs" that would be incurred by PSEG [Nuclear] beyond their normal [operating and marketing] costs. These "risks" are not costs that can be avoided by ceasing operations because they are not incurred. . . .

> [2] Staff determined that evaluating whether a unit is covering its avoidable costs with revenues is the appropriate approach to assessing whether the unit has met the financial criterion under the [ZEC] Act, based on staff's interpretation of the [ZEC] Act. . . .

[3] The spent fuel costs . . . are based on an unrealized and unpaid fee established in a DOE order for future storage as spent fuel. PSEG [Nuclear] demonstrated that these costs have not been historically paid or accounted for in historical finances since 2014. In summary, the spent fuel cost is not in effect, is not an avoidable cost, and should also be excluded from the financial analysis.

[4] Avoided costs by shutting down the units would not be as simple as zero labor and materials savings. The units must be maintained by personnel, at approximately a [fifty percent] level for five to seven years, until all decommissioning is completed and all spent fuel is secured. Because one-half of the unit's projected labor and non-labor costs are avoidable, they should be considered at this level in the financial analysis.

[5] The Board has traditionally used a net avoidable cost rate method to measure a generator's competitive offer into the markets.

[6] Levitan and staff concluded that, if the above referenced questionable costs such as risks and spent fuel . . . along with other adjustments – are removed from the financial projections, the units are financially viable as they stand.

The Board also noted the ET considered factors beyond the five main criteria of N.J.S.A. 48:3-87.5(e), including, in part, fuel resilience, fuel diversity, and PJM market changes.

The Board concluded that the Legislature was clear and specific regarding the criteria according to which the applicants were to be evaluated, and said criteria included consideration of operational and market risks as per

A-3939-18

the ZEC Act's plain language. The Board found that the ZEC Act required an applicant to demonstrate that the nuclear power plant is projected to not fully cover its costs and risks and that "risks" as defined in the ZEC Act included "operational risks, [such as] operating costs higher than anticipated," along with "market risks, [such as] market energy and capacity price volatility." The Board cited numerous cases in support of its plain language interpretation of the ZEC Act and recognized it may not, under the guise of interpretation, give the statute any greater effect than the statutory language allows.

The Board further found that the ZEC Act required it to consider other outside factors and legitimate policy goals of the state such as fuel diversity, resilience and the impact of nuclear power plant retirement on RGGI, New Jersey's economy, carbon and global warming. While the Board acknowledged the ET's finding that closure of the three nuclear power plants may have a relatively small impact on fuel diversity, the Board found that it was also important to consider that the nuclear power plants in New Jersey currently supply the equivalent of thirty-two percent of our power needs.

Concerning the environmental impact of closure, the Board found that neither solar nor offshore wind energy had the capacity to replace the loss of base load from the nuclear units. As a result, replacement power would increase carbon, which is in contravention of the state's stated goal of carbon

reduction, and New Jersey would become reliant on fossil fuel plants to make up for the loss of zero-emission capacity over the next three years. Consequently, the Board concluded that if the plants retire, it would likely be more difficult for New Jersey to meet its obligations to reach the state's goal of one-hundred percent clean energy by 2050.

As to the economic impact of closure, the Board addressed Levitan's conclusion about potential for negative resultant economic impact to the region. It explained that Levitan's economic impact analysis was based on a report concerning the Indian Point Nuclear Station in Westchester County, New York, an area with different demographics and a different economy than Salem County. According to the report, the relative impact of plant retirement in Salem County would likely be much greater compared to Westchester County and result in direct job loss not only to employees of the units but also to the ancillary businesses in the area. The Board concluded Salem County cannot afford this type of potential economic loss and that there are not enough employers in the county to support the layoffs from the closing units.

Ultimately, the Board concluded had the ET and Levitan considered the two risk factors as well as the other externalities, and had they reviewed the financial filings as submitted by the applicants, the plants would have been deemed eligible to receive subsidies, as a matter of fact. The Board

30

determined that Salem 1, Salem 2 and Hope Creek were eligible to receive ZECs and directed the EDCs to submit final tariffs consistent with its order.[3] This appeal followed.

V.

On appeal, Rate Counsel argues that the Board's decision is arbitrary, capricious, and unreasonable because the record does not support the conclusion that the applicants satisfied the financial eligibility requirement codified at N.J.S.A. 48:3-87.5(e)(3), and advances other general adequacy challenges. Notably, Rate Counsel does not contend on appeal that the applicants failed to satisfy any of the four remaining statutory criteria.

Monitoring Analytics, P3 and NJLEUC also support reversal of the Board's decision, as does amicus curiae AARP. PSEG Nuclear, Exelon, PSE&G, JCP&L, ACE and the Board, along with amicus curiae NEI, ask us to affirm the Board's decision.[4]

---

[3] One Board member, Commissioner Upendra J. Chivukula, dissented from the eligibility determination. Chivukula asserted the Board heavily considered the overall policy goal of achieving fifty-percent clean energy by 2030 and did not adequately consider its role as an economic regulator.

[4] Amicus curiae IPI advocates for neither affirmation nor reversal but explains why the social cost of carbon referenced in the ZEC Act at N.J.S.A. 48:3-87.3(b)(8) is the best available estimate for valuing the harm caused by carbon dioxide emissions. Similarly, Clean Air explains how nuclear plants contribute to cleaner air in New Jersey.

"Judicial review of agency determinations is limited." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citing Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). "[We] afford[] a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibilities." In re Restrepo, Dep't of Corr., 449 N.J. Super. 409, 417 (App. Div. 2017) (quoting Lavezzi v. State, 219 N.J. 163, 171 (2014)); see In re N.J. Am. Water Co., 169 N.J. 181, 195 (2001) ("[A]n agency's administrative action is presumptively valid."). Thus, "[a]n administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Allstars Auto, 234 N.J. at 157 (quoting Russo, 206 N.J. at 27); see also N.J.S.A. 48:2-46 (explaining that this court may "review any order of the board [of Public Utilities] and . . . set aside such order in whole or in part when it clearly appears that there was no evidence before the board to support the same reasonably.").

Rate Counsel argues there was error in the Board's rejection of its experts and methodology excluding operational risks, market risks and other non-realized costs from the applicants' certified cost projections. Rate Counsel also contends the ZEC Act's plain language required the applicants to

demonstrate that the nuclear power plant is projected to not fully cover its costs and risks, including operational risks, such as, operating costs higher than anticipated, along with market risks, such as market energy and capacity price volatility.

"The goal in cases of statutory construction is simple. It is the court's duty to seek and give effect to the Legislature's intent." Nw. Bergen Cty. Utils. Auth. v. Donovan, 226 N.J. 432, 443-44 (2016). A "statute's plain language . . . is the 'best indicator' of legislative intent." State v. Rodriguez, 238 N.J. 105, 113 (2019) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). "When the Legislature's chosen words lead to one clear and unambiguous result, the interpretive process comes to a close, without the need to consider extrinsic aids." State v. Shelley, 205 N.J. 320, 323 (2011). "Only if there is ambiguity in the statutory language will we turn to extrinsic evidence," including legislative history. Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195-96 (2007).

If a statute's plain language is ambiguous, we "are . . . warranted in placing considerable weight on the construction of the statute . . . by the administrative agency charged by the statute with the responsibility of making it work." In re PSE&G Co.'s Rate Unbundling, 167 N.J. 377, 384 (2001) (quoting Passaic Daily News v. Blair, 63 N.J. 474, 484 (1973)). Under those

circumstances, we "defer to 'the agency's interpretation . . . provided it is not plainly unreasonable.'" Ibid. (quoting Merin v. Maglaki, 126 N.J. 430, 437 (1992)). "Deference is particularly appropriate when, as here, the agency must construe and implement a new statute, 'or when the agency has been delegated discretion to determine the specialized and technical procedures for its tasks.'" In re Adoption of N.J.A.C. 7:26E-1.13, 377 N.J. Super. 78, 98-99 (App. Div. 2005) (citation omitted). "However, a reviewing court is 'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue.'" Allstars Auto, 234 N.J. at 158 (quoting Dep't of Children & Families v. T.B., 207 N.J. 294, 302 (2011)).

Here, the ZEC Act's financial eligibility criterion states that an applicant must:

> demonstrate to the satisfaction of the [B]oard, through the financial and other confidential information submitted to the [B]oard pursuant to subsection a. of this section, and any other information required by the board, . . . that the nuclear power plant's fuel diversity, air quality, and other environmental attributes are at risk of loss because the nuclear power plant is projected to not fully cover its costs and risks, . . . and that the nuclear power plant will cease operations within three years unless the nuclear power plant experiences a material financial change[.]
>
> [N.J.S.A. 48:3-87.5(e)(3).]

34

The plain language of the subsection makes clear that the Legislature intended for the Board to consider the applicants' "costs and risks" when determining eligibility. Had the Legislature intended for the Board to exclude the applicants' operational and market risks when analyzing financial eligibility under subsection (e)(3) and to instead assess only whether the applicants were "projected to not fully cover [their] costs," it would not have included the words "and risks" after "costs." In our view, to adopt Rate Counsel's position that the Board should have accepted the experts' methodology would render the Legislature's use of the words "and risks" in subsection (e)(3) meaningless, contrary to established principles of statutory construction.

The plain language of N.J.S.A. 48:3-87.5(a) lends further support to the Board's interpretation of the ZEC Act and its rejection of the experts' opinions. Subsection (a) mandates that the applicants' certified cost projections include "operation and maintenance expenses, fuel expenses, including spent fuel expenses, non-fuel capital expenses, fully allocated overhead costs, [and] the costs of operational risks and market risks that would be avoided by ceasing operations," along with "any other information . . . to demonstrate that . . . the nuclear power plant is projected to not fully cover its costs and risks . . . ." N.J.S.A. 48:3-87.5(a). It defines operational risks as including "the risk that

35

operating costs will be higher than anticipated because of new regulatory mandates or equipment failures and the risk that per-megawatt-hour costs will be higher than anticipated because of a lower than expected capacity factor." Ibid. It defines market risks as including "the risk of a forced outage and the associated costs arising from contractual obligations, and the risk that output from the nuclear power plant may not be able to be sold at projected levels." Ibid.

Had the Legislature intended for the Board to exclude the applicants' operational and market risks from their certified cost projections when analyzing financial eligibility under subsection (e)(3), there would have been no need for the Legislature to require applicants to provide information about their operational and market risks in subsection (a), or to define those terms. Similarly, had the Legislature intended for the Board to exclude operation and maintenance expenses, fuel expenses, including spent fuel expenses, non-fuel capital expenses and fully allocated overhead costs from the "costs" referenced in subsection (e)(3) when analyzing financial eligibility, there would have been no need for the Legislature to require applicants to provide this information to the Board.

In sum, the experts' methodology was inconsistent with the ZEC Act's plain language, which does not exclude operational risks, market risks and

36

other non-realized costs from the financial eligibility analysis. Thus, it was reasonable for the Board to reject the experts' opinions and to consider those categories of costs and risks. The Board was under no obligation to adopt the opinions of respondents' experts or the expert consultant that it retained to assist its staff. Board staff are charged with making recommendations to the Board. N.J. Dep't of Pub. Advocate v. Bd. of Pub. Utils., 189 N.J. Super. 491, 518 (App. Div. 1983). But per the plain language of N.J.S.A. 48:3-87.5, the ultimate eligibility determination for ZECs is to be made by the Board alone.

Additionally, the Board's decision concerning the applicants' financial eligibility for ZECs is amply supported by the voluminous financial submissions contained in the record, including but not limited to, the applications and the comments. In compliance with N.J.S.A. 48:3-87.5(e)(3), PSEG Nuclear certified on behalf of each applicant that each plant's projected costs exceeded its projected revenues and that each plant will cease operations within three years unless it experiences a material financial change. PSEG Nuclear submitted extensive financial information to support each plant's certified cost projections, summarized in charts listing various subcategories of costs and revenues showing that its costs and risks were projected to exceed its revenues by millions of dollars each year. PSEG Nuclear explained its inclusion of operational and market risks, consistent with the ZEC Act's

definition of those terms, along with its inclusion of spent fuel, support services, fully allocated overhead and capital expenditures as part of each plant's certified cost projections.

Consistent with the ZEC Act's plain language, the Board properly considered the applicants' operational and market risks, spent fuel costs, support services costs, fully allocated overhead costs, and capital expenditures included in their certified cost projections as part of its financial eligibility determination.  The Board also considered the ET's recommendations, the experts' independent analyses, the comments, among other information, and came to the reasoned conclusion that each plant is projected to not fully cover its costs and risks, and will cease operations within three years absent a material financial change, in satisfaction of N.J.S.A. 48:3-87.5(e)(3).

Although Rate Counsel does not contend that the applicants failed to satisfy the four remaining statutory eligibility criteria, it nonetheless asserts other general adequacy challenges pertaining to the Board's findings and conclusions.  Rate Counsel claims the Board: (1) failed to acknowledge that each of the five eligibility criteria must be met; (2) allowed "considerations beyond the five statutory criteria to color its analysis" by giving them greater weight; and (3) based its decision on a "fear" that PSEG Nuclear would close all three plants if it did not receive ZECs for each of them.  We disagree.

Despite the fact that the Board's discussion focused primarily upon the financial eligibility criterion, N.J.S.A. 48:3-87.5(e)(3), as it disagreed with the ET's findings and conclusions pertaining to financial eligibility, it also explained that applicants must satisfy all five statutory criteria. The Board summarized each of them in its decision in three different places, and recounted the ET's determination that the applicants had satisfied the first, fourth, and fifth criteria, explaining: (1) the units were "licensed to operate beyond 2030"; (2) the units "have not [or] are not receiving any other subsidies"; and (3) "the appropriate application fees were received."

The determinations track the plain language of the eligibility criteria found at N.J.S.A. 48:3-87.5(e)(1), (4), and (5). Although the Board did not expressly state that it was adopting the ET's findings as to the first, fourth, and fifth criteria, it did not disagree with those findings, which are adequately supported by the record and not disputed on appeal. Thus, we can infer from the broader context of the Board's decision that it incorporated those findings and conclusions as to the first, fourth, and fifth criteria.

Although the Board did not expressly state that the applicants had satisfied N.J.S.A. 48:3-87.5(e)(2), the Board's findings, coupled with the ET's more detailed determinations, support the implied conclusion that each plant, as a zero-emission facility, makes a significant and material contribution to the

39

air quality in the State by minimizing emissions that result from electricity consumed in New Jersey, minimizes harmful emissions that adversely affect the citizens of the State, and that retirement would significantly and negatively impact New Jersey's ability to comply with state air emissions reduction requirements, particularly with regard to global warming and ambient air quality. N.J.S.A. 48:3-87.5(e)(2).

Rate Counsel's assertion that the Board weighed certain other considerations, including fuel diversity, fuel security, and the economic impact of closure on the region and the State, more heavily than the eligibility criteria codified at N.J.S.A. 48:3-87.5(e), is unsupported by the record. There is nothing in the Board's decision to indicate that it weighed these factors more heavily than the statutory criteria. The extensive record in this case belies Rate Counsel's contention that the Board's decision is based on a fear that regardless of whether the eligibility criteria were met PSEG Nuclear would close the plants if it did not get subsidies for all three units.

Accordingly, Rate Counsel has not made a clear showing that the Board's ZEC eligibility determination is arbitrary, capricious, or unreasonable, or lacks fair support in the record. Allstars Auto, 234 N.J. at 157 (quoting Russo, 206 N.J. at 27).

A-3939-18

In its second point, Rate Counsel contends the Board's decision is arbitrary, capricious, and unreasonable because it failed to reduce the $0.004-per-kilowatt-hour charge established in the ZEC Act at N.J.S.A. 48:3-87.5(j)(1). Rate Counsel relies on a different section of the statute, N.J.S.A. 48:2-21(b), to support its contention, claiming that it mandates that the Board "[f]ix just and reasonable" rates to be imposed "by any public utility" and that the Board was required to harmonize N.J.S.A. 48:2-21(b) with the ZEC Act. Respondent NJLEUC and amicus curiae AARP support reversal for the same reasons. We reject this argument for the following reasons.

Citing N.J.S.A. 48:3-87.5(j), the Board found the ZEC Act required each EDC to file with the Board a tariff to recover from its retail distribution customers a charge in the amount of $0.004 per kilowatt-hour, which, according to the ZEC Act, reflects the emissions avoidance benefits associated with the continued operation of selected nuclear power plants. It further found that the ZEC Act provided that the Board shall approve the appropriate tariff after notice, the opportunity for comment, and public hearings, within sixty days after the EDCs' tariffs were filed. The applicants for ZECs are not regulated utilities and do not have authorized rates of return, nor are they subject to rate cases. Upon finding that each applicant was eligible to receive

ZECs, the Board directed the EDCs to submit final tariffs consistent with the Board's order.

"Administrative agency power derives solely from a grant of authority by the Legislature." Gen. Assembly of N.J. v. Byrne, 90 N.J. 376, 393 (1982). "An administrative agency exercises its delegated authority and applies its intended expertise pursuant to the Legislature's enabling act that frames the performance of the agency's assigned tasks." Acoli v. N.J. State Parole Bd., 224 N.J. 213, 226 (2016). We "review de novo an agency's interpretation of a statute and legal conclusions." Kaminskas v. State of N.J., Dep't of Law & Pub. Safety, 236 N.J. 415, 422 (2019). As noted, "[w]hen considering the meaning of a statutory provision, absent any legislative intent to the contrary, courts must give effect to the language of the provision." PSE&G's Rate Unbundling, 167 N.J. at 383-84. "If a statute's plain language is clear, we apply that plain meaning and end our inquiry." Garden State Check Cashing Serv., Inc., v. State Dep't of Banking & Ins., 237 N.J. 482, 489 (2019).

The ZEC Act's plain language makes clear that the Legislature did not authorize the Board to alter the $0.004-per-kilowatt-hour charge at the time of its initial eligibility determination. Under the plain meaning rule of statutory construction, "the Legislature's choice of the word 'shall,' . . . is ordinarily intended to be mandatory, not permissive." Jersey Cent. Power & Light Co. v.

42

<u>Melcar Utility Co.</u>, 212 N.J. 576, 587-88 (2013). Thus, N.J.S.A. 48:3-87.5(j)(1), through its use of the word "shall," requires the Board to effectuate the $0.004-per-kilowatt-hour charge to fund the ZEC program as follows:

> The [B]oard shall order the full recovery of all costs associated with the electric public utility's required procurement of ZECs and with the board's implementation of the ZEC program under this act, through a non-bypassable, irrevocable charge imposed on the electric public utility's retail distribution customers. Within 150 days after the date of enactment of this act, each electric public utility shall file with the [B]oard a tariff to recover from its retail distribution customers a charge in the amount of $0.004 per kilowatt-hour which reflects the emissions avoidance benefits associated with the continued operation of selected nuclear power plants. Within [sixty] days after the tariff filing required pursuant to this paragraph, after notice, the opportunity for comment, and public hearing, the [B]oard shall approve the tariff, provided that it is consistent with the provisions of this subsection. No later than the date of the [B]oard's order establishing the initial selected nuclear power plants to receive ZECs, each electric public utility shall implement the tariff and begin collecting from its retail distribution customers the approved charge.

Subsection (j)(3) of N.J.S.A. 48:3-87.5 specifies two limited scenarios under which the Board may reduce the per-kilowatt-hour charge to ensure that the ZEC program remains affordable to New Jersey retail distribution customers after its initial eligibility determination. These may apply if the Board determines that a reduced charge will nonetheless be sufficient to

A-3939-18

achieve the state's air quality and other environmental objectives by preventing the retirement of the nuclear power plants that meet the eligibility criteria established pursuant to subsections (d) and (e) of this section. Neither scenario is present here.

Under the first scenario, if the above criteria are met, "the [B]oard may, in its discretion, reduce the per-kilowatt hour charge imposed by paragraph (1) of this subsection starting in the second three year eligibility period and for each subsequent three year eligibility period thereafter . . . ." N.J.S.A. 48:3-87.5(j)(3)(a). Under the second scenario, if the above criteria are met, and "the [B]oard does not certify any nuclear power plants for a subsequent eligibility period pursuant to this Act, the [B]oard may, in its discretion, reduce the per kilowatt-hour charge imposed pursuant to paragraph (1) of this subsection . . . in the final year of the first eligibility period . . . ." N.J.S.A. 48:3-87.5(j)(3)(c).

Had the Legislature intended to grant the Board authority to reduce the $0.004-per-kilowatt-hour charge at the time of its initial eligibility determination, it would have said so. Instead, it carefully limited the Board's authority to alter the $0.004-per-kilowatt-hour charge. In short, the Board does not have the authority to override the Legislature's imposition of the $0.004-per-kilowatt-hour charge at the time of its initial eligibility determinations. See Jersey Cent. Power & Light Co., 212 N.J. at 600 ("[A]n

A-3939-18

administrative agency can only act reasonably within the scope of its delegated authority.").

N.J.S.A. 48:2-21(b), last amended in 1962, states, in relevant part:

> The [B]oard may after hearing, upon notice, by order in writing:
>
> 1. Fix just and reasonable individual rates, joint rates, tolls, charges or schedules thereof, as well as commutation, mileage and other special rates which shall be imposed, observed and followed thereafter by any public utility, whenever the [B]oard shall determine any existing rate, toll, charge or schedule thereof . . . to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential. In every such proceeding the [B]oard shall complete and close the hearing within [six] months and enter its final order within [eight] months after the filing of the order of the [B]oard initiating such proceeding, when such proceeding is on the [B]oard's own motion; or after issue is joined through the filing of an answer to a complaint, when such proceeding is initiated by complaint.

It is clear from the plain language of N.J.S.A. 48:2-21(b) that it applies to rate hearings involving public utilities either initiated on the Board's own motion or by complaint. "A rate hearing involves (a) the determination of the value of utility property (rate base), (b) an examination of utility expenses, and (c) the fixing of a fair rate of return to investors. The result is the base rate which the utility may charge its customers." In re Jersey Cent. Power & Light Co., 85 N.J. 520, 529 (1981).

A-3939-18

The matter before the Board was not a rate hearing pursuant to N.J.S.A. 48:2-21(b). But rather, it was implementation of the ZEC program under the ZEC Act, which was enacted decades after N.J.S.A. 48:2-21(b), and eligibility determinations on the three ZEC applications made by unregulated nuclear power plants. Although N.J.S.A. 48:2-21(b) and N.J.S.A. 48:3-87.5(j) are both included in Title 48, they do not reference each other and were not designed to serve a common purpose. Marino v. Marino, 200 N.J. 315, 331 (2009). Therefore, it is unnecessary to interpret these two provisions in pari materia with each other. See Richard's Auto City v. Dir., Div. of Taxation, 140 N.J. 523, 540 (1995) ("Aside from the[ir] clearly distinct purposes . . . the fact that the acts were not enacted during the same time and make no specific references to each other further indicates that they were not intended to be read in pari materia.").

Rate Counsel's reliance on In re Proposed Increase Intrastate Industrial Sand Rates, 66 N.J. 12, 14 (1974), is similarly unavailing. There, Central Railroad Company of New Jersey initiated a rate proceeding for a freight carriage rate increase affecting "the transportation of industrial sand from point of origin to several glass manufacturing companies in Northern New Jersey." Id. at 16. The Board found that the rate increase was "just and reasonable," approving it without establishing a rate base and the fair rate of

46                                                                    A-3939-18

return.  Id. at 17-18.  We reversed and remanded the matter because the Board failed to establish "a rate base and a fair rate of return thereon."  Id. at 18.  The Supreme Court affirmed.  Id. at 19, 29.

Based on our review, Industrial Sand also does not support the proposition urged by Rate Counsel that the Board had authority to reduce the statutorily mandated $0.004-per-kilowatt-hour charge to ensure its constitutionality during the ZEC proceedings.  The only relevant takeaway from Industrial Sand is that aggrieved parties may seek relief via other remedies, either "in the legislative halls" or in the courts by way of an action to restrain enforcement of a statute alleged to be unconstitutional, where a rate is set either unreasonably low and confiscatory, or unreasonably high and extortionate upon the public.  66 N.J. at 23-24, 29.

The parties' remaining arguments are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3939-18